JUDGE KNESS

MAGISTRATE JUDGE CUMMINGS

RECEIVED

JJ

2/24/2022

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

1:22-CV-01016

FILED

JN

3/1/2022

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

VIVEK SHAH,
      Plaintiff,

v.

DOW JONES & COMPANY, INC.,
      Defendant.

Civil Action No . _____

## VERIFIED COMPLAINT

### DEMAND FOR JURY TRIAL

Plaintiff VIVEK SHAH, *pro se*, alleges for his Verified Complaint against Defendant

DOW JONES & COMPANY, INC., based upon personal knowledge as to himself and his own

acts and experiences, and, as to other matters, upon information and belief, as follows:

### NATURE OF ACTION

1.     Dow Jones & Company, Inc.'s ("DJC") Risk Management & Compliance

("RMC") and Factiva products generate consumer reports on millions of consumers globally.

They do so primarily by conducting "Adverse Media Screening," which is a process of

assembling negative news from a wide variety of sources to create profiles on individuals. These

profiles are then made accessible to a large number of financial institutions specifically for

evaluating the risk-relationship of their customers.

2.     The financial institutions that purchase these services by DJC never reveal to their

customers that a consumer report was evaluated. *See, generally,* Exhibit H. If the consumer

report reveals a certain level of risk to the financial institution, then it would either deny the

financial product or service or terminate a pre-existing relationship. The customer is never made

aware of the source or existence of the consumer report that was used.

3. The content of these consumer reports contains adverse information, such as civil suits, civil judgments, records of arrest, *inter alia*, without any time limitation. All this violates the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq. Moreover, DJC does not recognize itself as a consumer reporting agency and thus does not disclose consumers its file on them. As a result, DJC has been unlawfully operating and profiting as a consumer reporting agency. This conduct is palpable and far reaching.

4. Plaintiff, proceeding *pro se*, brings this suit against Defendant under the civil remedies provided by the FCRA and the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA"), 815 ILCS 505/2, to redress the harm Plaintiff has suffered as a direct result of Defendant's conduct.

5. Plaintiff seeks monetary, injunctive, and declaratory relief against Defendant for a) willfully not complying with the various provision of the FCRA and b) engaging in unfair acts and practices.

**PARTIES**

6. Plaintiff Vivek Shah is a citizen of the United States and a resident of the State of Illinois. His principal place of residence is 236 Woburn Ln, Schaumburg, IL 60173.

7. Defendant DJC is an American publishing firm owned by News Corp, a publicly traded company on the NASDAQ. The company publishes The Wall Street Journal, Barron's, MarketWatch, Mansion Global, Financial News and Private Equity News. It formerly published the Dow Jones Industrial Average. Its principal place of business is at 1211 Avenue of the Americas, New York, NY 10036.

2

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

9.      This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Fed. Rules of Civ. P. The CFA claims allow this Court to grant injunctive relief. *See* 815 ILCS 505/10a(c).

10.     Venue is proper in this district under to 28 U.S.C. § 1391(b) because Defendant is subject to personal jurisdiction in this judicial district and conducts substantial business in this district. Plaintiff is a resident of Schaumburg, IL. Defendant conducts business globally and has an office in this district located at 1 S. Wacker Drive, Chicago, IL 60606. The claims involve events that occurred between Defendant and various financial institutions that are located across the United States and each of which conduct business in this district and formed a substantial part of the events and omissions giving rise to the claims occurring in this action.

## FACTUAL BACKGROUND

11.     On August 10, 2012, Plaintiff was arrested by the FBI for Mailing Threatening Communications with the intent to extort. The arrest was widely reported by various news outlets, including The New York Times, The Washington Post, and Fox Business Network.

12.     On September 11, 2013, after pleading guilty, Plaintiff was sentenced to 87 months of imprisonment by the United States District Court for the Southern District of West Virginia. The sentence was mildly reported by various media outlets.

13.     On February 4, 2019, Plaintiff was released from the custody of the Federal Bureau of Prisons ("BOP"). There was no media mentioning of Plaintiff's release.

A. **Chase Bank's Conduct**

14.     JPMorgan Chase Bank, N.A. ("Chase") is an American national bank headquartered in New York City. It offers more than 5,100 branches and 17,000 ATMs nationwide. It operates in more than 100 countries and had their assets of $2.49 trillion as of 2016.

15.     In or around October 2019, Plaintiff was added as an Authorized User to the following credit cards issued by Chase:

      a.  United Explore MileagePlus, with the primary account holder being his father

      b.  British Airways, with the primary account holder being his mother

      c.  Sapphire, with the primary account holder being his brother

16.     On or around February 1, 2020, Plaintiff applied with Chase for a credit card ("Chase Credit Card").

17.     On or around February 4, 2020, Plaintiff successfully opened a Business Checking Account under his own name at Chase.

18.     On or around February 15, 2020, Chase denied Plaintiff's Chase Credit Card application. Chase generated a false Statement of Reasons claiming that Plaintiff had insufficient credit history, when in fact Plaintiff had sufficient and substantial credit history with one of the highest credit ratings in the nation.

19.     On or around April 4, 2020, Plaintiff applied for a Paycheck Protection Program ("PPP") loan with Chase under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), 15 U.S.C. § 116, et seq..

20.     On or around April 17, 2020, Chase issued a letter to Plaintiff denying his PPP loan request, stating: "After a recent review of your accounts, we have decided to end our

relationship with you." Chase generated such false Statement of Reasons, despite all of Plaintiff's prior accounts with Chase having been maintained in stellar condition.

21.     On or around April 17, 2020, Chase issued a letter to Plaintiff's father, mother, and brother stating that it had closed the cards that were issued to Plaintiff as an Authorized User. It did not provide any reason whatsoever as to why the cards were terminated.

22.     On or around April 20, 2020, Plaintiff applied for an Amazon Prime Rewards Visa Signature Card ("Amazon Card") with Chase.

23.     On or around April 21, 2020, Chase, upon manual review, issued a letter to Plaintiff regarding his Business Checking Account, which stated: "After a recent review of your account, we have decided to end our relationship with you." Chase generated such letter, despite the Business Checking Account having been maintained in stellar condition.

24.     On or around April 22, 2020, Chase made a human error when it approved Plaintiff's Amazon Card application with a $6400 credit line.

25.     On or around April 24, 2020, Plaintiff again added himself as an authorized user on his father's United Explore MileagePlus credit card as well as his mother's British Airways credit card. New cards were issued to Plaintiff for both credit cards.

26.     On or around June 1, 2020, Chase, upon learning of its error, closed Plaintiff's Amazon Card under the guise that:1) there was a "rapid increase in revolving balances" and 2) there were "too many requests for credit or reviews of credit." Chase issued the letter despite the Amazon Card balance being paid in full on or before its due date, and there being no new information/credit-pull from which it could have determined that there were too many requests/review of credit. In fact, Plaintiff had on occasion even made *overpayments* of the balance due and thus has had a *negative* Amazon Card balance.

27.     On or around June 1, 2020, Chase again sent letters to Plaintiff's father and mother, stating that it had closed the cards that were issued to Plaintiff as an Authorized User. It yet again did not provide any reason whatsoever as to why the cards were terminated.

28.     On or around June 2, 2020, Plaintiff contacted Chase's customer service and requested it to reconsider and reinstate the Amazon Card

29.     On June 4, 2020, Chase issued a letter denying reinstatement of the Amazon Card, yet again, under the same guise that: 1) there was a "rapid increase in revolving balances" and 2) there were "too many requests for credit or reviews of credit." In fact, on the very day of the denial letter, the Amazon Card had a current balance of *negative* $85.81. In the history of the Amazon Card, Plaintiff at most utilized just 16.25% of the approved credit limit. Moreover, Chase did not check any of Plaintiff's credit reports again through which it could glean new information that could form the basis of the denial.

30.     On June 9, 2020, Plaintiff filed a suit in this Court against Chase for its unlawful conduct. *See* Shah v. JPMorgan Chase Bank, N.A., No. 1:20-cv-03355 (N.D. Ill. 2020). After Chase's Motion to Dismiss was denied by the Honorable Gary S. Feinerman, the parties settled out of court.

**B. Schwab's Conduct**

31.     The Charles Schwab Corporation ("Schwab") provides a full range of brokerage, banking and financial advisory services through its operating subsidiaries. Its broker-dealer subsidiary, Charles Schwab & Co., Inc. (member SIPC), offers investment services and products, including Schwab brokerage accounts. Its banking subsidiary, Charles Schwab Bank (member FDIC and an Equal Housing Lender), provides deposit and lending services and products.

32.     On or around July 17, 2019, Plaintiff opened and funded a Schwab Bank High Yield Investor Checking account in the amount of $5,000. Plaintiff also opened a Schwab One brokerage account at the same time.

33.     On or around July 24, 2019, Schwab notified Plaintiff that his accounts were being terminated. Schwab did not provide Plaintiff a reason for the termination. It then returned Plaintiff's $5,000 deposit back to the originating source of funds.

34.     On or around January 28, 2020, Plaintiff reapplied and successfully opened another Schwab Bank High Yield Investor Checking account and funded it in the amount of $1,000. Plaintiff also opened a Schwab One brokerage account at the same time.

35.     On or around February 5, 2020, Schwab notified Plaintiff that his accounts were being terminated. Schwab again did not provide Plaintiff a reason for the termination. It then returned Plaintiff's $1,000 deposit back to the originating source of funds.

36.     On or around February 6, 2020, Plaintiff contacted Schwab's customer service department and requested the reason for the termination. Plaintiff was advised that it was a "business decision" that could not be appealed. Plaintiff was not provided any further information beyond it being a "business decision."

**C. TradeStation's Conduct**

37.     TradeStation Group, Inc. ("TradeStation") is an online securities and futures brokerage firm and trading technology company. It is best known for the technical analysis software and electronic trading platform it provides to the active trader and certain institutional trader markets. The TradeStation analysis and trading platform is a professional electronic trading platform for financial market traders. It provides extensive functionality for receiving

real-time data, displaying charts, entering orders, and managing outstanding orders and market positions.

38.     Margin trading, or "buying on margin" means borrowing money from a brokerage company and using that money to buy stocks. Put simply, an investor takes out a loan, buying stocks with the lent money, and repaying that loan — typically with interest — at a later date.

39.     On or around July 28, 2020, Plaintiff opened a brokerage account along with a margin account with TradeStation.

40.     On or around August 3, 2020, TradeStation terminated Plaintiff's accounts. Since TradeStation did not provide Plaintiff a reason, he contacted TradeStation's customer service department, through which he was notified that their Accounts Team "does not disclose the reason" and that it was "a business decision that [was] final and [could not] be reconsidered." *See* Exhibit A.

**D.  TD Ameritrade's Conduct**

41.     TD Ameritrade, Inc.("TD Ameritrade"), member FINRA/SIPC, is a subsidiary of Schwab. It is a broker that offers an electronic trading platform for the trade of financial assets including common stocks, preferred stocks, futures contracts, exchange-traded funds, forex, options, cryptocurrency, mutual funds, fixed income investments, margin lending, and cash management services.

42.     On or around January 10, 2021, Plaintiff opened a TD Ameritrade brokerage account and was approved to trade stocks and options on margin.

43.     On or around January 13, 2021, Plaintiff's accounts were terminated for the following reason: "After careful consideration, TD Ameritrade has decided to end our business relationship with you." *See* Exhibit A.

**E. Fidelity's Conduct**

44.    Fidelity Investments Inc., ("Fidelity") is an American multinational financial services corporation based in Boston, Massachusetts. The company was established in 1946 and is one of the largest asset managers in the world with $4.9 trillion in assets under management as of June 2020 and a combined total customer asset value number of $8.3 trillion. Fidelity operates a brokerage firm, manages a large family of mutual funds, provides fund distribution and investment advice, retirement services, index funds, wealth management, cryptocurrency, securities execution and clearance, asset custody, and life insurance.

45.    Fidelity offers self-employed individuals a "Self-employed 401(k)." A self-employed 401(k)—also called a solo-401(k) or an individual 401(k)—is a special savings option for small-business owners who don't have any employees (apart from a spouse). In many ways, the self-employed 401(k) works the same way as a standard 401(k). Participants make contributions from their pre-tax earnings, and those savings can be invested in a range of vehicles to grow tax-deferred until withdrawn in retirement. Because participants are acting as both employer and employee, they can set aside more money each year than they could under a traditional 401(k), IRA, or other small business retirement account. Those high contribution limits, plus relatively easy plan administration, make the self-employed 401(k) an appealing option for business owners who meet the plan's requirements and want a significantly higher savings potential.

46.    On or around November 29, 2021, Plaintiff applied for a Self-employed 401(k) by filling out and mailing to Fidelity numerous forms, including a Defined Contribution Retirement Plan Basic Plan, Self-Employed 401(k) Adoption Agreement, Trust Agreement, and Self-Employed 401(k) account application.

47.     On or around December 7, 2022, Fidelity mailed to Plaintiff a New Account Profile for the Self-employed 401(k) plan, along with an account number.

48.     On January 11, 2022, at around 12:30pm Central, Plaintiff called Fidelity's 401(k) customer service number to ask Fidelity how he could get started with funding the account. After a lengthy hold, Plaintiff was casually informed that the account was closed due to "negative media" and "extortion."

**F.  DJC's Products and Services**

49.     DJC owns a wide variety of products and services. On its consumer-media end is its flagship publication, *The Wall Street Journal*. On its enterprise-media end, and most relevant to this suit, lies its "Professional Information" products.

50.     DJC segment's Professional Information products, which target enterprise customers, combine news and information with technology and tools that inform decisions and aid awareness, research and understanding. These products consist of its Knowledge & Insight, Dow Jones Risk & Compliance and Dow Jones Newswires products. Specific products include the following:

      a.  *Knowledge & Insight*. Dow Jones Knowledge & Insight products consist primarily of Factiva, a leading provider of global business content, built on an archive of important original and licensed publishing sources. Factiva offers content from approximately 33,000 global news and information sources from over 200 countries and territories and in 28 languages. This combination of business news and information, plus sophisticated tools, helps professionals find, monitor, interpret and share essential information. As of June 30, 2021, there were

nearly one million activated Factiva users, including both institutional and individual accounts.

    b.   *Dow Jones Risk & Compliance*. Dow Jones Risk & Compliance products provide data solutions for customers focused on anti-bribery and corruption, anti-money laundering, counter terrorism financing, monitoring embargo and sanction lists and other compliance requirements. Dow Jones's solutions allow customers to filter their business transactions and third parties against its data to identify regulatory, corporate and reputational risk, and request follow-up reports to conduct further due diligence. Products include online risk data and negative news searching tools such as RiskCenter Financial Crime Search and RiskCenter Financial Crime Screening and Monitoring for bulk screening. Dow Jones also provides an online solution for supplier risk assessment, RiskCenter Third Party, which provides customers with automated risk and compliance checks via questionnaires and embedded scoring. Feed services include PEPs (politically exposed persons), Sanctions, Adverse Media and other Specialist Lists. In addition, Dow Jones produces customized Due Diligence Reports to assist its customers with regulatory compliance.

    51.   **Intelligence Identifiers**. Factiva allows its users to "[t]rack competitors and targets with a comprehensive database of millions of public and private company profiles, plus financials and top executives."[1] generates "expansive profiles" on "40M+ executives"[2] across the globe.

---

[1] *See* https://www.dowjones.com/professional/factiva/.
[2] *See* https://www.dowjones.com/professional/intelligent-identifiers/.

52. **RiskCenter Third Party**. This tool allows its users to "screen third parties against [DJC's] proprietary risk database."[3] "Results from risk database screenings are automatically embedded into the risk assessment algorithm to triage third parties into high, medium or low risk based on a comprehensive risk assessment calculation."[4]

   a. <u>Enhanced Due Diligence Reports</u>. DJC's website states: "For cases that warrant additional investigative research, order enhanced due diligence reports via a secure, interactive portal within RiskCenter. Enhanced due diligence reports from Dow Jones provide in-depth investigative research to identify anti-bribery and corruption and reputational risk posed by your third parties. Research is conducted in more than 60 languages by researchers with localized specialist knowledge, enabling them to deftly navigate lesser-known public records, international media, local third-party databases and web sources."[5] "Standard reports include... Government and political affiliations, as well as national and local litigation records (civil, criminal bankruptcy, judgment/liens),"[6] among others.

   b. <u>Risk Search</u>. Users can search through DJC's pre-identified lists of global sanctions on people and companies, politically exposed person and their relatives and close associates, beneficial ownership data from Dun & Bradstreet ("D&B") including the degree of separation of owners of various entities, global law enforcement lists, Interpol Red Notices List, and "[s]pecial interest persons

---

[3] *See* https://www.dowjones.com/professional/risk/riskcenter-third-party/.
[4] *Id.*
[5] *Id.*
[6] *Id.*

12

including those who have been involved in a legal process related to key criminal categories."[7]

53.   **Due Diligence Research and Reports**. DJC's key area of coverage provides:

   a.  <u>Source of wealth</u>. "Detailed account of the subject's source of wealth, including employment income, property and high-value assets, share ownership and income from business transactions, loans and inheritances. We also highlight relevant issues of concern, such as political or government connections, corruption, money laundering, tax evasion, terrorism financing, fraud and other serious financial crimes."[8]

   b.  <u>Adverse media and significant litigation</u>. "We go beyond media reporting to include reviews of documents from local and national court records, as well as local regulatory databases, for evidence of regulatory breaches, disciplinary actions and litigation that may represent particular risks."[9]

   c.  <u>Beneficial ownership</u>. "Investigations of complex or opaque ownership structures to assess ultimate control. We draw on publicly available formal records— including those in certain jurisdictions requiring manual retrieval."[10]

   d.  <u>Types of Reports</u>. DJC provides different types of reports, including "Reputation and role in public life—reviews of adverse media to protect against reputational risk," "Adverse media, including noteworthy allegations and evidence of

---

[7] *Id.*
[8] *See* https://www.dowjones.com/professional/risk/dow-jones-due-diligence/.
[9] *Id.*
[10] *Id.*

involvement in/association with corrupt business practices or other regulatory risks," and "Litigation, criminal, bankruptcy and judgment searches."[11]

54. **Adverse Media Screening**. "Adverse media screening involves the interrogation of third-party data sources for negative news associated with an individual or company."[12] The tool is "[a] searchable database of adverse media profiles."[13]

55. DJC advocates for financial institutions to create "Special Interest Person" profiles using its due diligence tools.[14] *See* Exhibit G.

56. DJC's Q&A section recommends that allegations of criminality should be taken into consideration regardless of a formal conviction.[15] *See* Exhibit F.

57. On February 21, 2022, Plaintiff requested from DJC a complete copy of his consumer report/file, along with an offer to provide any identification required. As of the date of the filing of this Verified Complaint, DJC has not even acknowledged the request.

**G. Other facts**

58. Chase, Schwab, TradeStation, TD Ameritrade and Fidelity are among the many other financial institutions that are paid subscribers to the full panoply of RMC products offered by DJC, including, but not limited to, its RiskCenter, Sanctions Compliance, Due Diligence Research and Reports, and Adverse Media Screening.

59. Each of the aforementioned financial institution routinely utilizes the RMC products to onboard each of its customer and to continually monitor each customer throughout the period of their active relationship.

---

[11] *Id.*
[12] *See* https://www.dowjones.com/professional/risk/adverse-media-screening/.
[13] *Id.*
[14] *See* https://www.dowjones.com/professional/risk/glossary/financial-crime/special-interest-person/.
[15] *See* https://visit.dowjones.com/risk/content/financial-crime-adverse-media-questions/#lp-pom-block-311.

60.     Each adverse action taken by Chase, Schwab, TradeStation, TD Ameritrade and Fidelity were in fact, made solely based on the adverse items of information contained in the consumer reports provided by DJC.

61.     When Chase took a series of adverse actions against Plaintiff, instead of informing him that the information contained in the consumer reports provided by DJC were the true reason for denial and termination of the various credit and checking products, it decided to falsify the statement of reasons or otherwise simply stated that it was ending their relationship. Similarly, Schwab TradeStation, and TD Ameritrade ended their relationship with Plaintiff without informing him of the reason or the source of the reason, when the sole-source of information was the consumer reports provided by DJC. Fidelity terminated its relationship with Plaintiff without providing an official reason; however, a 401(k) specialist was able to provide Plaintiff the unofficial reason – to wit "negative media" and "extortion."

62.     Plaintiff has no knowledge as to the names of the specific institutions that have an agreement with Defendant and have access to its consumer reports. As a result, Plaintiff is clueless as to which other financial institutions he should be applying with for his financial needs.

63.     Defendant's consumer reports primarily consist of adverse media, which have reported many false and inaccurate news regarding his arrest, conviction and personal life. The false information, stealing and publicizing of his copyright protected photos by the media in general were in-fact what formed the basis of another lawsuit in this Court. *See* Shah v. NYP Holdings, Inc., et al., No. 1:21-cv-06148 (N.D. Ill. 2021).

64.     Plaintiff intended to open bank accounts, credit cards, seek loans, and invest his money in securities. He intends to live a law-abiding life; however, financial institutions make it

extremely difficult for arrestees and former felons like him to obtain life's necessities, such as a bank account.

65.     Defendant's acts and omissions have substantially impacted Plaintiff's livelihood. Plaintiff has to date been unable to open a 401(k) to save money on taxes and invest his money for retirement purposes. He suffers from extreme anxiety, stress and is worried about his diminished finances. He suffers from a generalized fear that applying for a financial product would be futile and be met with embarrassment. He has no idea which financial institutions have access to Defendant's unlawful products and services. By not being able to invest his money, he has so far been losing an average of 2% of his cash due to inflation, which as of late has been rising rapidly due to the global pandemic. Each time Plaintiff applies for a credit product, it adversely affects his credit score and interest rates.

66.     Exhibit "A" contains true and correct copies of letters of denials or terminations from various financial institutions at which Plaintiff applied, as well as a chat conversation with a customer service representative at TradeStation.

67.     Exhibit "B" contains a true and correct copy of DJC's "Adverse Media Screening Best Practices Guide."

68.     Exhibit "C" contains true and correct screenshots of DJC's select product offering as extracted from its website.

69.     Exhibit "D" contains true and correct copies of sample demos created by DJC showcasing its products.

70.     Exhibit "E" contains a true and correct copy of DJC's User Agreement.

71.     Exhibit "F" contains a true and correct copy of DJC's Q&A as made available on its website.

72.     Exhibit "G" contains a true and correct copy of DJC's Glossary of the meaning of a "Special Interest Person Profile" as made available on its website.

## FIRST CAUSE OF ACTION

## Violations of the FCRA, 15 U.S.C. § 1681e

73.     The allegations of all the foregoing and following paragraphs are incorporated by reference as if fully set forth in this paragraph.

74.     The FCRA, 15 U.S.C. §§ 1681 *et seq.*, was enacted in 1970 to ensure, among other things, that "consumer reporting agencies" adhere to strict guidelines for maintaining and distributing fair and accurate consumer reports.

75.     The FCRA creates a set of individual consumer rights and a private right of action by which to vindicate those rights.

76.     DJC is a "consumer reporting agency" as defined by the FCRA because it accepts "monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and… uses… means or facility[ies] of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

77.     The data that DJC compiles and distributes and/or sells to third parties constitutes a "consumer report" as defined by the FCRA because it contains "written, oral, or other communication[s] of… information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit

17

or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b of this title." 15 U.S.C. § 1681a(d).

78.     Defendant compiles, creates and distributes information to its users about individual consumers including adverse news, global sanctions lists, civil judgments, bankruptcy records, records of arrest, records of conviction, criminal judgments, civil liens, business ownership interests, source of wealth, employment income, share ownership, property valuation, close associates, loans, inheritances, political connections, disciplinary actions, beneficial ownership interests, and litigation history, to name a few.

79.     Defendant disseminates information such as consumers' name, job title, job location, phone number, fax number, biography, education history, names of colleagues, among other.

80.     Despite DJC's clearly defined status as a "consumer reporting agency" and its intent to disseminate "consumer reports," it requires its users to agree to the following in its End User Agreement: "Customer acknowledges that Dow Jones is not a 'consumer reporting agency' and that the Dow Jones Data does not constitute a 'consumer report' or 'investigative consumer report' as such terms are defined in the Fair Credit Reporting Act, 15 U.S.C. §1681, et seq. (FCRA), or any applicable state or national fair credit reporting laws.  Accordingly, Customer represents and warrants that it will not use the Dow Jones Data for any permissible purpose under FCRA or applicable state or national fair credit reporting laws."[16] See Exhibit E. However, DJC has intentionally marketed its services to financial institutions specifically for establishing consumers' eligibility for the enumerated factors in 15 U.S.C. § 1681a(d)(1).

---

[16] See https://tax.thomsonreuters.com/content/dam/ewp-m/documents/tax/en/pdf/other/sanctions-ownership-list.pdf.

81.     Section 1681e(d)(1) of the FCRA requires that a consumer reporting agency provide, to any person who regularly and in the ordinary course of business furnishes information about any consumer to the consumer reporting agency ("Furnisher"), a "Notice To Furnishers of Information: Obligations Under the FCRA" ("Furnisher Notice").

82.     Section 1681e(d)(2) requires that a consumer reporting agency provide, to any person to whom it provides a consumer report ("Users"), a "Notice to Users of Consumer Reports: Obligations of Users Under the FCRA" ("User Notice").

83.     The Furnisher Notices and the User Notices inform Furnishers and Users of their responsibilities under the FCRA, such as a Furnisher's responsibility to provide accurate information or Users' responsibility to provide adverse action notices.

84.     Defendant has continually failed to provide Furnisher Notices to Furnishers as required by the FCRA.

85.     Defendant has further failed to provide User Notices to Users as required by the FCRA.

86.     Section 1681e(b) mandates that when a consumer reporting agency prepares a consumer report that it shall follow reasonable procedures to assure the maximum possible accuracy or the information concerning the individual about whom the report relates.

87.     Defendant has continually failed to follow reasonable procedures to assure the maximum possible accuracy of the information that it provides in its consumer reports.

88.     As a result of Defendant's conduct described herein and its willful violations of §§1681e(d) &1681e(b), Plaintiff has suffered harm as described herein. Plaintiff seeks actual and punitive damages available under 15 U.S.C. § 1681n.

## SECOND CAUSE OF ACTION

## Violation of the FCRA, 15 U.S.C. § 1681c

89.     The allegations of all the foregoing and following paragraphs are incorporated by reference as if fully set forth in this paragraph.

90.     Section 1681c(a) of the FCRA prohibits consumer reporting agencies from making any consumer report containing certain items of information:

a.  Civil suits, civil judgments, and records of arrest that, from date of entry, antedate the report by more than seven years or until the governing statute of limitations has expired, whichever is longer; and

b.  Any other adverse item of information, other than records of convictions of crimes, which antedates the report by more than seven years.

91.     Defendant made a consumer report of Plaintiff which contained an arrest record from August 10, 2012 – a time period in excess of seven years from the date of the report.

92.     Adverse media reporting, negative publicity, bad news, filing of a criminal complaint, information and indictment against Plaintiff, and other such adverse items of information that were older than seven years from the date of the consumer report, are all prohibited by 15 U.S.C. § 1681c(a).

93.     Defendant routinely collects information of civil suits, civil judgments, records of arrest, and other adverse information (other than records of convictions) spanning decades and disseminates such consumer reports to its users on a regular basis.

94.     As a result of Defendant's conduct described herein and its willful violations of § 1681c(a), Plaintiff has suffered harm as described herein. Plaintiff seeks actual and punitive damages available under 15 U.S.C. § 1681n.

## THIRD CAUSE OF ACTION

### Violation of the FCRA, 15 U.S.C. § 1681g

95.     The allegations of all the foregoing and following paragraphs are incorporated by reference as if fully set forth in this paragraph.

96.     Section 1681g(a) imposes a requirement upon a consumer reporting agency to clearly and accurately disclose to a consumer all information in the consumer's file at the time of the request.

97.     Plaintiff's request to obtain his consumer report/file was met with futility, despite an offering of any type of identification that DJC might have required.

98.     As a result of Defendant's conduct described herein and its willful violations of § 1681g(a), Plaintiff has suffered harm as described herein. Plaintiff seeks actual and punitive damages available under 15 U.S.C. § 1681n.

## FOURTH CAUSE OF ACTION

### Violation of the Illinois CFA, 815 ILCS 505/2

99.     The allegations of all the foregoing and following paragraphs are incorporated by reference as if fully set forth in this paragraph.

100.    815 ILCS 505/2 makes it an unfair or deceptive act or practice to engage in any activity that violates the CFA.

101.    The CFA is a regulatory and remedial statute intended to protect consumers, borrowers, and businesspersons against fraud, unfair methods of competition, and other unfair and deceptive business practices.

102.    Plaintiff meets the CFA definition of "consumer." See 810 ILCS 505/1.

21

103. As described above, Defendant has violated the "unfair" prong of the CFA in that Defendant's conduct violates numerous provisions of the FCRA.

104. The above-described acts and practices offends public policy, are immoral, unethical, oppressive, and unscrupulous, and causes substantial injury to consumers.

105. It is the public policy of the State of Illinois to secure for all individuals within the state the "access to financial freedom." Illinois Human Rights Act, 775 ILCS 5/1-102.

106. The conduct complained of here is so oppressive that Plaintiff is exhausted in finding a suitable financial institution that would allow him to open a credit card, brokerage account, and retirement account to secure his financial future.

107. The injury is not outweighed by any countervailing benefits to consumers.

108. The injury is not one that consumers could reasonably avoid, especially when financial institutions do not reveal the fact that DJC's consumer reports were utilized in the determination of an application by a consumer.

109. As a result of Defendant's conduct described herein and its willful violation of the CFA, Plaintiff has suffered harm as described herein. Plaintiff seeks monetary damages, including compensatory and punitive, as well as declaratory and injunctive relief.

## DEMAND FOR JURY TRIAL

110. Under Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.

## REQUESTED RELIEF

111. Plaintiff respectfully asks that the Court grant him the following relief:

a. Enter a declaratory judgment finding that:

       i.    The foregoing actions of Defendant violates the FCRA and CFA; and

      ii.    Defendant is a "consumer reporting agency" that furnishes "consumer reports" to its users.

b.   Enter a permanent injunction:

       i.    Enjoining Defendant and its employees, agents, officers, and directors from engaging in the unfair acts and practices complained of herein; and

      ii.    Directing Defendant and its employees, agents, officers, and directors to remove any and all adverse media from the consumer reports it has on Plaintiff.

c.   Award compensatory damages against Defendant to Plaintiff, in an amount to be determined by the jury that would fully compensate Plaintiff for injuries caused by the conduct of Defendant alleged herein;

d.   Award punitive damages against Defendant to Plaintiff, in an amount to be determined by the jury that would punish Defendant for its willful, wanton, outrageous, malicious, grossly negligent, fraudulent and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

e.   Award Plaintiff his reasonable attorneys' fees and costs;

f.   Award prejudgment interest to Plaintiff; and

g.   Order such other relief as this Court deems just and equitable.

Dated: February 24, 2022

Respectfully submitted,

/s/ Vivek Shah
Vivek Shah
236 Woburn Ln
Schaumburg, Il 60173

## **VERIFICATION OF COMPLAINT**

I, Vivek Shah, hereby declare under penalty of perjury that the foregoing facts contained

in this Complaint are true and correct to the best of my knowledge.

Executed on February 24, 2022

/s/ Vivek Shah
VIVEK SHAH

Exhibit A



**CHASE** *for* BUSINESS          Sign out

☰ ‹ Exit

# Application Status

## Paycheck Protection Program loan

**Status: Declined**

We reviewed your application for the SBA Paycheck
Protection Program and were not able to approve
this loan.

Your loan wasn't approved for the following
reason(s):

- After a recent review of your accounts we have
  decided to end our relationship with you.

Please keep in mind that our Chase Customer
Service team will be unable to answer any questions
about this loan product.

Business Legal Name: VIVEK M SHAH



January 13, 2021

Vivek Shah
236 Woburn Ln
Schaumburg IL, 60173-2136

Re: You Will Need to Close Your TD Ameritrade Account(s)

Dear Vivek Shah,

After careful consideration, TD Ameritrade has decided to end our business relationship with you. This means you will have to close your account(s) ending in 232510735.

In the meantime, your account has been restricted to liquidating transactions only, meaning you won't be able to make new purchases. If your account has check writing, ATM/Debit card, or other cash services, please do not use these features, as they have been disabled.

**Your Next Steps**
You'll have to either liquidate and close your account by February 12, 2021, or have a transfer in progress to another brokerage firm by that date. To initiate a transfer to another brokerage firm, please contact that firm for the necessary forms and information.

If you have not closed your account and do not have a transfer in progress by the close of business on February 12, 2021, we may liquidate your account and mail you a check for the proceeds, or we may issue stock certificates for positions you hold in the account and mail them to you.

Because we are ending our business relationship with you, you will not be able to open new TD Ameritrade accounts in the future. We appreciate your past business and regret any inconvenience this situation may cause you.

Thank you for your prompt attention to this matter.

Sincerely,

Retail Risk Management
817-490-2050

Deposit Mail Services
PO Box 182051
Columbus, Ohio 43218



Questions?
1-877-382-8854
1-614-436-4636; outside the U.S.

VIVEK M SHAH
7190 W SUNSET BLVD STE 1411
LOS ANGELES, CA 90046-4415

April 21, 2020

Important Information: **We have decided to close your account**

Dear VIVEK M SHAH:

After a recent review of your account, we have decided to end our relationship with you.

**Here's what you need to know and do**

We enclosed important account closing information outlining the steps you may need to take.

You've received this letter as an account owner and should share this information with others listed on the account. Even though we are closing your banking and/or investment accounts, any Chase Auto, Mortgage and/or Student loan or lease accounts you may have with us will remain open. Please continue to make regular payments.

You may receive additional account closing notifications if you have other accounts under a different name or address.

If you have any questions, call us Monday through Sunday from 7 a.m. to 12 a.m. Eastern Time at 1-877-382-8854. If you're outside the United States, call us collect at 1-614-436-4636.

Sincerely,

Chase Customer Service

Enclosed:

Deposit Account Closure Information

LC-115EXMP
JP Morgan Chase Bank, N.A.

VIVEK M SHAH
7190 W SUNSET BLVD STE 1411
LOS ANGELES, CA 90046-4415 USA



### Deposit Account Closure Information

**We will close the following account on June 19, 2020 and decline any transactions**

**Account (last 4 digits)**

0326

**Here's what we recommend you do by June 19, 2020**

- Cancel all automated deposits and withdrawals on your account.
- Open a new account at another institution.
- Transfer your account balance by writing a check from your Chase account or initiating an online wire transfer using chase.com.
- Redeem any eligible Ultimate Rewards points linked to your account.
  - Travel or cash back rewards must be redeemed before your account is closed.
  - Other rewards can be redeemed for 30 days after the account is closed by visiting a Chase branch or by calling one of the telephone numbers listed on the cover letter.

We will mail you a check for any remaining funds within 10 business days after we close the account and verify all deposits and payments.

LTR-115EXDDA
JP Morgan Chase Bank, N A

# CHASE ⬡

Cardmember Services
P.O. Box 15298
Wilmington, DE 19850-5298

**Questions?**

🖥 www.chase.com/amazon

📞 1-800-290-1316

We accept operator relay calls

32459 RCS 001 000 15620 - NNNNNNNNNNNN CLO058
**Vivek Shah**
236 Woburn Ln
Schaumburg IL 60173-2136

June 04, 2020

# Update:      **We didn't reopen your credit card account**

Your account ending in 1400

Dear Vivek Shah:

Thank you for asking us to reopen your credit card account above. We reviewed your credit information and decided not to reopen it because:
RAPID INCREASE IN REVOLVING BALANCES
TOO MANY REQUESTS FOR CREDIT OR REVIEWS OF CREDIT

**Here's where we got our information**
Our decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below. You have a right under the Fair Credit Reporting Act to know the information contained in your file at the consumer reporting agency. The reporting agency played no part in our decision and is unable to supply specific reasons for our decision.

Experian
P.O. Box 2002
Allen, TX 75013

(888) 397-3742

Details about your right to know the information in your credit report are provided at the end of this letter.

If you owe a balance on the account:
- We will continue to send you monthly statements.
- You then must pay either the minimum monthly payment or the full balance.
- We still apply all terms and conditions of the account.

If you have questions, please call us at 1-800-290-1316. We're here Monday through Friday from 9 a.m. to 7 p.m. Eastern Time.

Sincerely,

Chase Card Services

**See the end of this letter for important information**

**FAIR CREDIT REPORTING ACT NOTICE**

Under the Fair Credit Reporting Act, you also have a right to a free copy of your report from the reporting agency, if you request it no later than 60 days after you receive this notice. In addition, if you find that any information contained in the report you receive is inaccurate or incomplete, you have the right to dispute the matter with the reporting agency.

**EQUAL CREDIT OPPORTUNITY ACT NOTICE**

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this creditor is the Bureau of Consumer Financial Protection, 1700 G Street NW, Washington, DC 20006.



Cardmember Services
P.O. Box 15298
Wilmington, DE 19850-5298

**Questions?**

📞 1-800-290-1316

🖥 www.chase.com/amazon

18814 RCS 001 000 15320 - NNNNNNNNNNNN CSO116
**Vivek Shah**
236 Woburn Ln
Schaumburg IL 60173-2136

June 01, 2020

# Update:    **We closed your account and we want to explain why**

Your account ending in 1400

Dear Vivek Shah:

Based on a recent review of your account and credit information, we decided to close your credit account above.

**Here are the reasons we closed your account**
- RAPID INCREASE IN REVOLVING BALANCES
- TOO MANY REQUESTS FOR CREDIT OR REVIEWS OF CREDIT

**Here's where we got our information**
Our decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below. You have a right under the Fair Credit Reporting Act to know the information contained in your file at the consumer reporting agency. The reporting agency played no part in our decision and is unable to supply specific reasons for our decision.

    Experian
    (888) 397-3742
    P.O. Box 2002
    Allen, TX  75013

Details about your right to know the information in your credit report are provided at the end of this letter.

**These are your next steps**
- Destroy all cards and access checks.
- Contact any merchants that automatically bill the account for ongoing services and make other payment arrangements.
- Make payments on any remaining balance by the due date on your statements.
- Review the current terms and conditions that still apply to this account.
- Tell anyone else that uses the account that it's closed.

**If your account earns rewards, check your rewards activity**
- If you redeem rewards through Chase, you have at least 30 days to use them or you'll lose them.
- If you redeem rewards through a partner loyalty program, we'll transfer them to the partner.
- Before your rewards are used or transferred, you can lose them for program misuse, fraudulent activities, failure to pay, bankruptcy, or other reasons described in the terms of your rewards program.
- See the terms of your rewards program for details.

**Please see the end of this letter for important information.**

If you have questions, please call us at 1-800-290-1316. We're here Monday through Friday from 9 a.m. to 7 p.m. Eastern Time. We accept operator relay calls.

Sincerely,

Chase Card Services

**FAIR CREDIT REPORTING ACT NOTICE**
Under the Fair Credit Reporting Act, you also have a right to a free copy of your report from the reporting agency, if you request it no later than 60 days after you receive this notice. In addition, if you find that any information contained in the report you receive is inaccurate or incomplete, you have the right to dispute the matter with the reporting agency.

**EQUAL CREDIT OPPORTUNITY ACT NOTICE**
The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this creditor is the Bureau of Consumer Financial Protection, 1700 G Street NW, Washington, DC 20006.



## Thank you                                                                    ✕

> I do not have the reason on our end as it is a business decision.

You at 13:46, Aug 3:

> Which department made the decision?

Caroline at 13:47, Aug 3:

> It is by our Accounts team.

Caroline at 13:47, Aug 3:

> It is a business decision. I apologize for the inconvenience.

You at 13:47, Aug 3:

> How ma yI contact the accounts team?

You at 13:47, Aug 3:

> *may I

Caroline at 13:48, Aug 3:

> They do not disclose the reason and do not speak with customers directly.

You at 13:49, Aug 3:

> How can I request a reconsideration?

Caroline at 13:50, Aug 3:

> This is a business decision that is final and cannot be reconsidered.

You at 13:51, Aug 3:

> Based on what information?

Caroline at 13:51, Aug 3:

> I cannot specify.

You at 13:52, Aug 3:

> Did you use any consumer reports or credit reports or any other type of public/private or third party generated reports that you relied upon?

Caroline at 13:53, Aug 3:

> We do have to verify information and the individual based on your account application. I cannot provide further information and apologize for the inconvenience.

Caroline at 13:53, Aug 3:

> Thank you for choosing TradeStation and have a great day!

You at 13:53, Aug 3:

> Where or with whom did you verify the information?

Info at 13:53, Aug 3:

Thank you for chatting with us.

+                                                                               →

Exhibit B

**DOW JONES
RISK &
COMPLIANCE**

# Adverse Media Screening Best Practices Guide

Best Practices     Regulations & Guidance

## Introduction

Adverse media screening (AMS)—also known as media monitoring or negative news screening—is an important part of customer due diligence (CDD). At its most simple, AMS is the process in which a customer, or prospective customer, is compared (or "screened") against negative information and data sources. AMS allows firms to identify and prevent potential problems before they arise and also helps organizations avoid reputational damage.

But there are many challenges with AMS; most business leaders and financial crime professionals in regulated institutions are very familiar with them. Their frontline teams often are inundated with an unsustainable volume of alerts and their time is consumed by lengthy debates about the relevance of these alerts. Politically motivated information constantly flows through traditional and social media, making news screening even more onerous. It can be difficult to determine what is valid versus specious.

"My bank would spend hours assessing AMS results. Senior management was very engaged but without any clear guidelines, we ended up debating each one on a case by case basis. It was really hard to tell what was a financial crime risk versus what was a reputational risk. In addition, some of the alerts we debated were for a foreign subsidiary that had no day-to-day links to our client, except that they fell under the same global corporate umbrella. We agonized over whether or not this meant we could work with our client and often debates went on for months until eventually, our client went elsewhere."

Another challenge is that whilst regulators say they expect adverse media checks, they do not specify the most effective ways of running these programs. They are not direct in their requirements. Some firms even have interpreted this to mean that AMS is a nice to have and ignore the fines set out by regulators who clearly expect to see a well-developed adverse media approach built into a firm's CDD procedures.

"Our firm was operating across multiple jurisdictions and it was particularly hard to know the political leanings of local media. As a compliance team, we tended to fall back on secondary coverage from an international journal or news source if there was adverse media coverage coming from within the region on any of our clients. This gave the bank comfort but also increased the time it took our analysts to process each case within these jurisdictions."

## An Overview of AMS Best Practices



It is clear that institutions need to develop policies and procedures to identify and address high-risk entities. This includes defining when to perform adverse media searches, how to balance manual and automated searches, what information to search for and how to respond to alerts.

Our research team analyzed responses to our benchmarking survey—a global AMS practices survey we conducted in partnership with Themis Financial Crime Agency in September 2019—from more than 100 respondents, including senior leaders and financial crime specialists. Over the past few months, we also spoke to 12 of the respondents, a mixture of frontline staff, C-suite leaders and board members.

## The result?

## A comprehensive guide to industry-leading AMS

The intention of this guide is to outline best practices that—if implemented—will give firms an easy-to-use and structured approach to AMS. The ultimate aim is to help organizations identify special-interest and reputationally exposed persons and entities according to carefully considered categories of risk, enhancing protections against financial crime.



Set your risk appetite clearly & perform a risk assessment



Screen at the right time



Build checks based on credible, current news sources



Create & maintain an audit trail



Use (the right) technology to reduce burdens



Establish a strong anti-financial crime culture

## Regulations & Guidance

Compared to regulatory requirements on customer screening for sanctions and politically exposed persons (PEPs), guidance for screening against adverse media is less structured and more often, open to interpretation. But to counter illicit financial flows, the volume of adverse media guidance continues to increase around the world. The table below summarizes what regulators and organizations have said about the importance of adverse media checks.

| Organization | Stance on AMS | Process |
|---|---|---|
| Financial Conduct Authority | "should be used" | "at onboarding and for periodic reviews" |
| The Financial Crimes Enforcement Network (FinCEN) | "should use as part of a risk-based approach" | "as part of CDD" |
| Monetary Authority of Singapore | "should be conducted" | "as part of CDD" |
| Hong Kong Monetary Authority | "should be included" | "in suspicious transaction reports" |
| The Financial Action Task Force (FATF) | "should gather sufficient ... publicly available information" | "for CDD and enhanced due diligence" |
| The Wolfsberg Group | "CDD programs must be designed to identify elements including sanctions exposure, source of funds, adverse media." "KYC, CDD and EDD methods to screen customers for adverse media/negative news must be designed to provide adequate coverage." | "for know your customer checks, CDD and enhanced due diligence" |
| Joint Money Laundering Steering Group | "any adverse media reports may be relevant" | "for CDD and enhanced due diligence" |

UP NEXT

Learn how to conduct stronger
risk assessments





**DOW JONES**
**RISK &**
**COMPLIANCE**

MAIN PAGE



Adverse Media Screening Best Practices Guide

## Set your risk appetite clearly & perform a risk assessment

Because AMS rarely returns a binary result, setting the parameters for what constitutes acceptable risk is a critical first step. This is known as establishing a firm's risk appetite: the amount and type of risk that an organization is willing to pursue or retain.

A firm's risk appetite for adverse media should specify the following:

### Type of report

Firms might not accept potential customers with certain alleged offenses but would consider customers with less serious allegations. For example, an allegation of non-financial, nonviolent crime may be treated differently to claims of financial crimes, such as bribery, corruption or sanctions evasion (which may be considered a higher risk). Allegations often carry less weight than convictions for the same offense.

### Degree of linkage

Firms will need to determine actions when adverse media results return matches with customers who have linked entities. For example, a global, publicly traded firm may own a distant subsidiary that was served previously with anti-money laundering (AML) enforcement actions. If allegations have been made against a corporate entity in another country or one of its subsidiaries, a judgement about whether or not to onboard that customer needs to be made.

### Extent of remedial action

A company may have taken remedial action to reduce the risks of financial crime following a news report or a historical charge; firms may want to take this action (or its absence) into account. In serious historic claims, a firm may want to perform a site visit or interview the management of the prospective customer to ensure that these corporate issues have been resolved and that clear governance structures are in place to prevent repeat issues.

### Timeliness

Firms should determine if certain types of adverse media should be considered lower-risk over time. Reducing risk levels for findings that may have normally qualified a customer at a higher level of risk provides evidence that past issues have been resolved and in the absence of subsequent regulatory attention, penalties or adverse media, certain alerts no longer pose a threat.

### Criminal or reputational risk

It is important to understand the difference between financial crime and reputational risk. This means defining what constitutes a predicate crime in the firm's different jurisdictions of operation. For instance, the U.K. is an "'all crimes' jurisdiction," whereas in many other countries (such as the U.S.), only certain crimes are considered as predicate crimes to money laundering.

"Start with principles and use these to set the tone for all client assessments."

- Tier 2 bank

"Without the right principles or a clear risk position, the board will waste time debating the importance of individual results."

- Tier 2 bank

"We don't want to receive any negative media attention but we complete AMS (mainly) to meet the financial crime-related legislation of the counties we operate in."

- Tier 1 bank



"Leaders need to decide how far back is relevant. Only the past two years? Or forever? But the call ultimately depends on risk."

- Tier 2 bank

"AMS results are right on our leadership's agenda."

- Tier 1 bank

Every firm has a unique risk appetite. Because of this, senior management teams should draw up an adverse screening risk tolerance map. A risk tolerance map sets clear boundaries for what is or is not acceptable to the senior management team. It plots different news risks and is bolstered by examples that are relevant to the business.



The map can include what criteria management teams expect for various adverse media instances in order to have sufficient information before a positive or negative decision is made. It is critical for management to set clear risk categorization thresholds and outline the relevant actions and details required for each, so frontline teams know when and how to act. The risk tolerance map should be updated on an ongoing basis, with actual past cases (though anonymized) plotted out on the risk tolerance map.

Other recommended actions include:

- Conducting a further investigation.
- Understanding what remedial actions have taken place historically.
- Considering a site visit or an interview with the current management team.
- Commissioning an external due diligence report.
- Involving an escalation committee.
- Completing a suspicious activity report (SAR), where appropriate.

If a monitoring team has followed the risk appetite and AMS framework but still cannot reach a decision, firms should set up a senior escalation forum. This forum enables business leads to present the case to the money laundering reporting officer (MLRO) to discuss the potential issues before the senior management team or business head ultimately makes a decision. This avoids customer cases being stuck in endless decision chains where nobody is empowered to make the call.

We were debating historic charges of bribery for one of our clients, a well-known global engineering, construction

2/4

and services company. Over 10 years prior, our client was ordered to pay more than $300 million to the SEC for its participation in a decade-long scheme to bribe Nigerian government officials to obtain contracts. Since then, the client went through a significant merger, changed its management team and pledged adherence to a corporate governance framework. Senior management then was able to assess all of the mitigating documentation provided by the client at an escalation committee. To gain final assurance, our CEO requested that two team members fly out to meet the client's new management team. Only by meeting face-to-face could we be confident that they had an effective anti-bribery and corruption culture. This assured us that the historic charges were firmly in the past, belonging to an old corporate identity.

| Good Practice | Poor Practice |
|---|---|
| Articulate a clear risk appetite statement that considers the use of AMS. This includes a statement on what is considered to be relevant adverse media coverage and the governance approach to approval and exception handling. | No documented approach to AMS. Firms may find that debates about whether or not to accept customer risks eat up excessive time for senior management and their teams. |
| Have senior management complete a firm-wide risk assessment. This evaluates the firm's exposure to financial crime risk based on the type of customers it serves, jurisdictions it operates in, products served to them and channels through which the products are delivered. Senior management signs off on an adverse media risk tolerance map detailing the categorization thresholds and relevant actions. | No clear understanding of the specific risks the firm is exposed to. The firm may not be completing adequate screening or may not be looking in the right areas. |
| Establish an escalation forum for business heads and compliance leaders to raise and align on difficult adverse media cases. | No guidance as to what is and is not acceptable. The firm may find that decisions are made on the basis of an individual's risk appetite, instead of the firm's. This might lead to healthy business being turned away, or worse, unhealthy business being accepted. |
| Record keeping is robust, ensuring there is a clear and defensible basis for the decision to either reject or accept a customer with adverse media. Document this well, so the firm can demonstrate a transparent, consistent approach to customer risk mitigation. | Without transparency in the decision-making process, a firm may find that its frontline begins to arbitrage and hold back adverse media cases for more relaxed senior managers. |
| Add a selection of past adverse media cases to the risk tolerance map, building a picture of the firm's approach. This helps frontline teams understand the firm's customer tolerance better. | Without transparency in the decision-making process, a firm may find that its frontline begins to arbitrage and hold back adverse media cases for more relaxed senior managers. |

We had a string of clients complain that they were unhappy with how long our KYC procedures took. When we investigated, we found that a couple of our relationship managers had been holding back client cases with adverse media hits until they knew that our CRO was out of the office. Our CRO was quite risk averse, so the risk managers were waiting until he was away and submitting their client cases to the management committee hoping it would get an easier ride.



CONTINUE READING

SKIP TO

## Screening

Screen at the right time

News Sources

Auditing

Technology

Culture

Main Page

**DOW JONES**

© 2020 Dow Jones, Privacy Notice & Cookie Notice.



**DOW JONES RISK & COMPLIANCE**

MAIN PAGE

Adverse Media Screening Best Practices Guide

## Screen at the right time

In our benchmarking survey, nearly nine in 10 firms said they screened new customers during the onboarding process. However, our interviews brought to light that many regulated entities lack a defined screening strategy, leading to variations in identifying who should be searched and how often.

What is best practice? Search for adverse media as part of your customer onboarding due diligence—i.e., before account opening—and perform ongoing monitoring based on a schedule guided by your company's policies and the specific customer's risk levels.

It also is important to identify "trigger events." These are activities that may warrant a prioritized, unscheduled investigation of news sources as a result of newly discovered account activity, law enforcement inquiries, media scandals or higher-risk counterparty relationships. Of course, this also includes when customer profiles are updated with newly identified information (such as names or aliases, date of birth corrections or knowledge of business dealings outside the local jurisdiction).

"We pay particular attention to comprehensive negative news screening at the beginning of our relationships with clients…"

- Tier 2 bank

"After the [Panama Papers scandal], we screened any associated parties that were mentioned in this scandal or that had links to the names of individuals, companies or places mentioned in the scandal."

- Tier 2 bank

| Good Practice | Poor Practice |
|---|---|
| Build AMS into onboarding procedures for all new customers and for newly added accounts, as part of standard CDD checks. | Customers are only screened on a risk-based cadence. This compounds risk; the missed illicit activity does not create a higher risk rating and thus no additional due diligence is carried out. |
| Screen for links to connected parties, including for UBOs and directors, as well as secondary and tertiary relationships and any PEPs. | If firms only screen their customers, they may miss important links to other business associates, connected parties or beneficial owners (e.g., money launderers or criminal organizations, which rarely conduct illicit activity through their own named accounts). |
| ...lete ongoing monitoring and AMS on an ongoing basis for all | Customer activity changes over time but firms without automated |

Build in automated adverse media checks so that all customers are screened automatically on a routine basis.

Establish mechanisms to monitor new scandals in the public domain, identifying triggers for event-driven reviews.

"The release of the Panama Papers in the press meant we did a forced re-screen of any of our customers who had offshore companies around the world."
- Tier 2 bank

CONTINUE READING

SKIP TO

Technology

Auditing

Culture

News Sources

Evaluating the integrity of news sources

Assessment

Main Page

© 2020 Dow Jones. Privacy Notice & Cookie Notice.

**DOW JONES RISK & COMPLIANCE**

MAIN PAGE

Adverse Media Screening Best Practices Guide

## Build checks based on credible, current news sources

"Knowing whether a story is true or politically motivated remains a challenge."
- Tier 2 bank

Firms need to know whether a story is true, politically motivated and/or if it describes an allegation rather than a conviction. In our benchmarking survey, only half of respondents said they were confident that adverse media stories were from credible sources.

Sometimes it is hard to tell what is genuine news and what is politically motivated between nation-states. Social media also has increased the flow of politically motivated information and it can be hard to determine what is true or simply spurious. Our firm had a lot of clients in the MENA region and during and after the Arab Spring particularly, it was hard to know whether or not to believe corruption allegations. Because we didn't know the political leanings of local papers, we tended to seek out secondary coverage from an international journal or news source if there was negative news coming out of our clients' regions.

**Validity**

The credibility of the original adverse media sources is an issue. Firms often are uncertain about how to verify news coverage. As a basic first step, use sources that have been vetted, such as Dow Jones Factiva, a proprietary news archive that holds more than 33,000 reputable sources. The sources are selected based on several factors, including quality and reputation.

**Timeliness**

Those responsible for screening suggest that in some cases or reports, after initial identification of an allegation, further updates are not flagged to the screening teams. This could mean that

updates in court cases, for example, are not reflected and that checks are being made against outdated information. Firms should use tools that generate alerts in real time, presenting a holistic view of customer risk and ensuring that compliance teams can see the full picture at all times.

**Scope**

Organizations that rely on traditional search engines or manual processes to carry out due diligence on customers risk missing critical pieces of information. Valuable content for adverse screening stories is tucked away in password-protected sites and/or sits in unindexed data repositories. For example, 74 percent of Factiva's premium sources are not freely available on the web.

**Context & Comprehensibility**

News reports in non-Latin scripts can prove to be problematic. For example, Middle Eastern and South Asian names are not always easy to decipher, as the spellings may vary and there may not be enough information in the screening results to determine whether the hit is positive or not. Factiva contains in-depth profiles of 22 million public and private companies and 42 million people that span 28 languages.

| Good Practice | Poor Practice |
|---|---|
| Select the best AMS solutions by challenging vendors' content sources and their approach to managing the speed, quality and integrity of the data. | Only using search engine-driven alerts. While these are useful, they apply no intelligence to the source or naming standards, making the results imperfect and/or incomplete. |
| Test the credibility of the original information and understand the sources. If an allegation is unclear, check if other news outlets report the same story. | Not properly investigating the sources of news feeds, resulting in inaccurate source information or content duplication across different platforms. |
| Make updates to adverse media news sources regularly. | |
| Conduct real-time, automated updates or at a minimum, update news information regularly in the adverse media tool. | |
| Incorporate checks that encompass non-Latin scripts into screening work. | |



CONTINUE READING

SKIP TO

Technology

Culture

Assessment



Auditing

Substantiate decisions
with a formal audit trail

Screening

Main Page

DOW JONES

© 2020 Dow Jones, Privacy Notice & Cookie Notice.



**DOW JONES RISK & COMPLIANCE**

MAIN PAGE

Adverse Media Screening Best Practices Guide

Create & maintain an audit trail

The audit trail is linked to the policies that firms put in place to guide investigatory teams. Yet, our interviews uncovered a wide range of policies in this space. Leading firms specify a clear timeframe and approach for teams if they need to narrow down search criteria, whilst also giving teams flexibility. Yet some firms seem not to keep a full and comprehensive record of activities related to customer screening for alerts and searches.

An audit trail is a key part both of management reporting and regulatory proof of due diligence. When research confirms that adverse information relates to a potential customer, it is important to have a well-defined escalation process in place to efficiently surface the case to the compliance department and senior management.

No matter the ultimate outcome, always keep a documented audit trail with related supporting materials that show the rationale behind decisions. Getting this wrong can be costly, particularly in the worst-case scenario where a firm is found to be involved in a financial crime scandal. If a regulator or an auditor is inspecting customer files, they will want to see the basis on which the decision was made. This is in addition to seeing evidence that due diligence was performed and how the steps taken relate to local regulations and the firm's policies In some jurisdictions, specific senior managers may even be held accountable by the regulators if they cannot explain a historic decision.

"I cannot overemphasize the importance of having investigatory teams that understand the local context. But these groups must be able to explain each of their decisions to internal and external auditors."
- Tier 1 bank

| Good Practice | Poor Practice |
|---|---|
| Document all governance committee minutes clearly, including the discussion of the risk, the decision and the rationale behind it. | Where records are poor or poorly maintained, firms may struggle to explain a historic decision. |

Create a clear audit trail showing the rationale behind any decision.

Where firms do not document a clear set of actions with an adverse media decision, they may miss further developments in the customer case. These could be positive (the allegations are thrown out by the court) or negative (an allegation is proven in court).

Keep adverse media reports in the relevant customer file for future reference.



A few years ago, we took on a high-profile PEP. At the time, adverse media searches were completed, which we knew because it was checked off on the CDD checklist for the client. There also was a reference in management minutes but it was made only in passing, noting that the CEO and ExCo had accepted the client risk. There was no explanation or supporting documentation and most of the people involved in the decision-making process have since left the firm. Unfortunately, this case has been picked out by an external audit team but we have no way to explain our decision. We could get penalized because of poor record-keeping practices.

## CONTINUE READING

Technology

Implementing technology to streamline processes

## SKIP TO

Culture

Assessment

Screening

News Sources

Main Page

D | DOW JONES

© 2020 Dow Jones, Privacy Notice & Cookie Notice



**MAIN PAGE**

Adverse Media Screening Best Practices Guide

# Use (the right) technology
# to reduce burdens



Two and a half exabytes of data and millions of news articles are created every day. Keeping up with the news is challenging for most professionals but the volume of publicly available information is particularly challenging for those responsible for AMS.

In fact, in our benchmarking survey, nearly a quarter of respondents (24 percent) said they receive more than 1,000 alerts per month, with some employing more than 50 screening professionals to manage this deluge of information.

This was the case for those without the appropriate tools especially:

"Examining every possible news source available on a constant basis is simply not possible." - Tier 2 bank

"We screen for adverse media using specific watchlists but given our scale we only screen those we consider to be high risk." - Tier 1 bank

"We don't use an automated [AMS] screening system in all geographies and in areas where we do not, analysts spend a huge amount of time discounting AMS 'hits.'" - Tier 1 bank

"We have some systems and tools in place but they are not uniformly understood." - Tier 2 bank

"The adverse media system is good but generates a lot of duplicate alerts and lots of news articles that may not be related to our client or connected parties. Sometimes it becomes difficult to tell whether the news in the alerts is genuine or not." - Tier 2 bank CEO

Screening technology helps firms address an otherwise unsustainable volume of matches. Sophisticated adverse media tools can reduce false positives and assist with a number of other challenges, including the ability to screen customers that fall into different risk categories continually.

Minimze false alerts by enriching customer data with additional elements to aid the matching process; modern AMS tools use structured data to associate and classify an event, person and/or entity. This process enables researchers to verify and contextualize the data before it reaches analysts.

Automated systems also can serve as an initial, strategic frontline to avoid "the noise" associated with manually reviewing high volumes of low-quality alerts. Artificial intelligence

1/2

AI accelerates the categorization of hundreds or thousands of articles, eliminating those that are irrelevant. Some vendors also use AI technology—such as natural language processing (NLP)—to extract information from unstructured data, such as a date of birth or occupation, and then create rules based on that information to further improve matching accuracy.

For example, Dow Jones recently launched an advanced adverse media screening solution that uses AI to screen customers against negative news in real time. Financial crime experts trained the algorithm with real-life examples, substantiated with high-quality licensed news sources and risk data. This is important because with AMS, the quality of the output—or AI

| Good Practice | Poor Practice |
|---|---|
| Use NLP and other AI technologies to identify news articles related to selected topics, so analysts can focus only on the most relevant risk information. | Not using technology to refine adverse media search results. Firms often are overwhelmed with an unsustainable volume of alerts, which cannot be processed in a timely manner. This leads to further risks. |

Use AI to enhance the matching process and reduce false positives. AI goes beyond simple name matching and is particularly helpful when screening against unstructured data.



CONTINUE READING

**Culture**
Fostering a culture of collaborative compliance

SKIP TO

Assessment

Screening

News Sources

Auditing

Main Page

**DOW JONES**

© 2020 Dow Jones, Privacy Notice & Cookie Notice.



MAIN PAGE



Adverse Media Screening Best Practices Guide

## Establish a strong anti-financial crime culture

Anti-money laundering (AML) and combating the financing of terrorism (CFT) controls easily can be undermined by a poor culture of compliance. By contrast, a strong AML culture can help prevent shortcomings, identify issues before they become a concern and lead to more efficient compliance policies.

The FCA highlighted a lack of a positive AMS culture at several banks on which it imposed fines for AML failures, too. For example, when it imposed a £896,100 fine in June 2018 on the U.K. branch of Canara Bank, it said:

"There was no evidence that money laundering risks or adverse media related to its customers were considered by senior management of Canara during the onboarding process or subsequently."

In a separate 2019 case, the FCA found serious and sustained shortcomings in Standard Chartered Bank's anti-financial crime controls and culture, CDD and ongoing monitoring. The FCA notice highlighted that the UAE branches were required—but failed—to repeat due diligence in response to a number of trigger events, including when negative press warranted

"I have been present in decision-making forums on adverse media where revenue still trumps reputational risk or even financial crime risk. This only actually works if there is a really strong culture that puts compliance over revenue."
- Tier 2 bank

I worked for a firm with an exceptionally well-informed CEO who consistently drove a positive AML culture. She encouraged us all to understand the risks we faced as an organization and challenged us to thoroughly understand every one of our clients. She had a famous and simple catchphrase that we all learned to ask when looking at client risk: 'Does it make sense?' She was challenging us to look at our client relationships and ask, 'why were they banking

with us and not with another bank? What was the purpose and nature of the account?' This also applied to AMS. She asked us to imagine a worst case scenario—imagine explaining our actions in court. Why did we decide to take this client on and what made us comfortable with the risks identified? Our business model didn't change and we still took many new clients but we learned to understand them better. This level of questioning was part of our corporate makeup.

| Good Practice | Poor Practice |
|---|---|
| The chief executive and other C-suite leaders visibly communicate their commitment to AML/CFT compliance. Leadership drives the force for AML culture, not just the risk management function. | Senior management has not set a clear tone from the top. AMS becomes more of a tick-box exercise, with the potential for negative media to be underplayed or ignored. |
| Integrate effective AML/CFT controls into standard processes so that compliance becomes part of business as usual. | Without a clear risk appetite or tolerance set communicated by senior management, decision-making on adverse media alerts can become dominated by an individual's personal risk assessments. |
| Staff understand not only the "what" for compliance but also the "why." This leads to enhanced compliance; people understand the value of their work and the objective of control activities. | Key individuals turning a blind eye to protect revenue, which can lead to shortcuts and risks with severe consequences. |



Main Page

Assessment   Screening   News Sources   Auditing   Technology

D | DOW JONES

© 2020 Dow Jones, Privacy Notice & Cookie Notice.

Exhibit C



**DOW JONES RISK & COMPLIANCE**

**KEY BENEFITS**

## Advanced Adverse Media Screening

Introducing AI-powered advanced negative news screening

Adverse media screening is recognized by regulators as an integral part of the customer due diligence process. The use of negative news from reputable sources can be instrumental in assessing risk.

However, financial firms face a variety of operational challenges in following this guidance. In a survey we conducted, nearly half of the respondents said that fewer than five percent of matches are "true positives," with a similar number saying accurate identity matching is an issue.

Request a Demo

AutoFill with LinkedIn

First Name *

Last Name *

Email *

Job Title *

Job Function *

Company *

Country or Region *

☐ I would like to receive updates and special offers from Dow Jones and affiliates, including recommended content or information on upcoming events. I can unsubscribe at any time.











Exhibit D



© 2016 Dow Jones & Company. All rights reserved.





**DOW JONES** FACTIVA    Home

Executive > Executive Snapshot

Show executive information for: Apple, Inc. ∨

# Timothy Cook

Timothy Donald Cook MBA
Chief Executive Officer & Director
Apple, Inc.
One Apple Park Way
Cupertino, California 95014-2083
United States
Phone: 1 408 996 1010
Fax: 1 408 996 1010

**Table of Contents**

**Biography**                              **Executive Details**

**Lists Of Colleagues**                    **News**

**Biographies**

Biography

Currently, Timothy Donald Cook occupies the position of Chief Executive Officer & Director at Apple, Inc. Mr. Cook is also on the board of NIKE, Inc., Duke University and Robert F. Kennedy Human Rights.

He previously held the position of Director-North American Fulfillment at International Business Machines Corp., COO-Reseller Division & Senior VP-Fulfillment at Intelligent Electronics, Inc. and Vice President-Corporate Materials at Compaq Computer Corp.

Timothy Donald Cook received an MBA from Duke University and an undergraduate degree from Auburn University.

Source: FactSet Research Systems Inc.

▲ Add to Watch List

Biography                 Your Executive Snapshot will appear,

- Executive Details

**Additional Information**

**Education**

| Institution | Degree | Major | Year Degree Attained |
|---|---|---|---|
| Duke University | MBA | N/A | 1988 |
| Auburn University | B | N/A | 1982 |

**Appointments**

International Business Machines Corp., Director-North American Fulfillment, 1983 - 1994
Apple, Inc., Director, Chief Executive & Operating Officer, 1998
The National Football Foundation & College Hall of Fame, Inc., Director, 2010
Intelligent Electronics, Inc., COO-Reseller Division & Senior VP-Fulfillment, 1994 - 1997
Compaq Computer Corp., Vice President-Corporate Materials, 1997 - 1998
NIKE, Inc., Lead Independent Director, 2005
Duke University, Trustee, 2015
Robert F. Kennedy Human Rights, Director, 2016

Source: FactSet Research Systems Inc.

**Additional Information**

**Education**

| Institution | Degree | Major | Year Degree Attained |
|---|---|---|---|
| Duke University | MBA | N/A | 1988 |
| Auburn University | B | N/A | 1982 |

**Appointments**

International Business Machines Corp., Director-North American Fulfillment, 1983 - 1994
Apple, Inc., Director, Chief Executive & Operating Officer, 1998
The National Football Foundation & College Hall of Fame, Inc., Director, 2010
Intelligent Electronics, Inc., COO-Reseller Division & Senior VP-Fulfillment, 1994 - 1997
Compaq Computer Corp., Vice President-Corporate Materials, 1997 - 1998
NIKE, Inc., Lead Independent Director, 2005
Duke University, Trustee, 2015
Robert F. Kennedy Human Rights, Director, 2016

Source: FactSet Research Systems Inc.

- Lists Of Colleagues

a list of colleagues,

Source: FactSet Research Systems Inc.

## - Lists Of Colleagues

### Management Team and Key Personnel

| Name | Job Title |
|------|-----------|
| Peter Ronald Denwood | President |
| Michael Joseph Boyd Jr | Board Member |
| Mauro Cardaio | Board Member |
| Daniela D'angelo | Procurator |
| Thomas Owen Moyer | Procurator |
| Luca Maestri | Procurator |
| Giulia Onofri | Procurator |
| Heather Moser Grenier | Procurator |
| Robert Howard Mcdavitt | Procurator |
| Timothy Donald Cook | Procurator |

Source: D&B

### Board of Directors

| Name | Job Title |
|------|-----------|
| Timothy Donald Cook MBA | Chief Executive Officer & Director |
| Arthur D Levinson PhD | Independent Chairman |
| Monica Cecilia Lozano | Independent Director |
| Andrea Jung | Independent Non-Executive Director |
| Albert Arnold Gore Jr. | Independent Director |
| Ronald D Sugar PhD | Independent Director |
| Susan Lynne Wagner MBA | Independent Director |
| James A Bell | Independent Director |

### Management Team and Key Personnel

| Name | Job Title |
|------|-----------|
| Timothy Donald Cook MBA | Chief Executive Officer & Director |
| Jeffrey E Williams MBA | Chief Operating Officer |
| Luca Maestri | Chief Financial Officer & Senior Vice President |
| Kevin M Lynch MBA | Vice President-Technology |
| Sabih Khan | Senior Vice President-Operations |

executive details and relevant news articles.

Exhibit E

**Dow Jones End User Agreement**

The terms set out in this End User Agreement ("**EUA**") apply to the Dow Jones Data, as defined below, which may be included from time to time in the services delivered to the client, customer, or subscriber identified in the order form ("**Customer**") under the agreement concluded with the provider, licensor, or granting party identified in the order form ("**Distributor**") for the provision of the subscription screening services (the "**Services**"), hereinafter referred to as the "**Agreement**"). Unless otherwise defined in EUA, any defined terms shall have the meanings given in the Agreement.

In this EUA, the following terms shall have the following meanings:

"**Applicable Data Protection Law**" means, in so far as applicable to the supply of the Dow Jones Data as part of the Services under the Agreement, all laws and regulations governing the protection of individuals with regard to the processing of Personal Data (including without limitation, security requirements for and the free movement of such Personal Data), including, but not limited to, as applicable: (a) the General Data Protection Regulation (EU) No. 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data ("GDPR") and any national law implementing or supplementing the GDPR; and (b) in the event that the UK withdraws from the European Union, any UK laws or regulations replacing, succeeding or re-enacting the GDPR;

"**Criminal Data**" means Personal Data relating to criminal convictions and offences or related security measures, including relating to the alleged commission of offences by a Data Subject or proceedings for an offence committed or alleged to have been committed by the Data Subject or the disposal of such proceedings, including sentencing;

"**Customer Query**" means any screening transaction request made by Customer within the Services for the delivery of Dow Jones Data;

"**Customer Query Report**" means any screening transaction result displayed within the Services in response to a Customer Query.

"**Data Controller**" means in relation to Personal Data any person who determines the purposes for which any Personal Data is, or is to be Processed;

"**Data Processor**" in relation to Personal Data, means any person (other than an employee of the data controller) who Processes the Personal Data on behalf of the Data Controller;

"**Data Security Breach**" means the unauthorized acquisition, access, use or disclosure of Dow Jones Data that compromises the security or privacy of such data to the extent the compromise poses a significant risk of financial, reputational, or other harm to the individual, consistent with Applicable Data Protection Law;

"**Data Subject**" means an individual who is the subject of Dow Jones Data;

"**Dow Jones**" means Factiva Limited, a company incorporated in England and Wales under number 3773253 and with registered address at The News Building, 7th Floor, 1 London Bridge Street, SE1 9GF London, England, acting on behalf of Dow Jones & Company, Inc. and any of its affiliated companies;

"**Dow Jones Data**" means any and all Personal Data, including Special Categories of Data and Criminal Data, Processed or transferred to Distributor by Dow Jones in connection with the supply of the Services;

"**EEA**" means the European Economic Area, consisting of all Member States of the European Union, plus Norway, Iceland and Liechtenstein, and for purposes of this EUA and the Agreement shall also include Switzerland and the UK after its withdrawal from the European Union;

"**Personal Data**" means any information relating to an identified or identifiable individual;

"**Permitted User**" *means* an individual authorised to access and use the Dow Jones Data and who is either: (a) an individual employee of the Customer; (b) an individual performing the functions of an employee on a temporary basis, independent contractor or consultant, in each case who is performing work for the Customer;

"**Process," "Processing," or "Processed**" means any operation or set of operations that is or may be performed upon Personal Data in relation to or as a result of this EUA and the Agreement, whether or not by automatic means, including, but not limited to, collection, recording, organization, storage, access, transmission, adaptation, alteration, retrieval, consultation, use, disclosure, dissemination or otherwise making available, alignment, combination, blocking, disposal, deleting, erasure, or destruction;

"**Special Categories of Data**" means Personal Data revealing racial or ethnic origin, political opinions, religious or philosophical beliefs, trade-union membership, genetic data, biometric data for the purpose of uniquely identifying a natural person, and data concerning health, a natural person's sex life or sexual orientation; and

"**UK**" means England, Wales, Scotland and Northern Ireland.

**1. Licence**

1.1 Distributor will supply the Dow Jones Data to the Customer during the term set forth in the order form and grants to the Customer a non-exclusive, non-transferable, non-sub licensable, non-assignable licence to use the Dow Jones Data, subject to the terms and conditions of the Agreement and this EUA.

1.2 The Dow Jones Data contains information derived from publicly available sources, and will be regularly up-dated by Distributor as updates are received from Dow Jones. Dow Jones retains control and ownership of the form and content of the Dow Jones Data, and although Dow Jones may alter the Dow Jones Data from time to time (and Distributor may alter the format of

the data), its fundamental nature will not be changed. The Customer and Permitted Users will not, under the Agreement or this EUA, acquire any ownership rights in the Dow Jones Data.

**2.    Terms of use**

2.1    The Customer and Permitted Users shall use the Dow Jones Data in strict compliance with this EUA.

2.2    Except to the extent permitted or required for the Customer's permitted use under Section 2.1, the Customer and/or Permitted Users shall not: (a) reproduce, distribute, display, sell, publish, broadcast or circulate the Dow Jones Data to any third party, nor make the Dow Jones Data available for any such use; or (b) create or store in electronic form any library or archive of the Dow Jones Data save that, and notwithstanding anything to the contrary, the Customer shall be entitled to retain copies of the Dow Jones Data necessary for archival, regulatory and/or compliance purposes. The Customer's right to retain such copies as set forth above shall survive termination/expiration of this EUA provided that it no longer actively uses the Dow Jones Data within the Services.

**3.    Warranties**

3.1    Distributor cannot warrant that the Dow Jones Data includes a complete or accurate archive of every public figure or their associates in each country. Except as specified in this EUA all express or implied representations, warranties, conditions and undertakings in relation to the provision of the Dow Jones Data are excluded.

3.2    Customer acknowledges that Dow Jones is not a "consumer reporting agency" and that the Dow Jones Data does not constitute a "consumer report" or "investigative consumer report" as such terms are defined in the Fair Credit Reporting Act, 15 U.S.C. §1681, et seq. (FCRA), or any applicable state or national fair credit reporting laws. Accordingly, Customer represents and warrants that it will not use the Dow Jones Data for any permissible purpose under FCRA or applicable state or national fair credit reporting laws.

**4.    Customer Information**

Customer acknowledges and agrees that Distributor may report to Dow Jones information regarding Customer's subscription (including, but not limited to, Customer's name, date added as a Customer, and the number of Customer Queries). This information may be used by Dow Jones to verify the relevant usage of the Dow Jones Data and the payments due and payable by Distributor to Dow Jones in this respect. Customer hereby consents to the collection and processing of the Customer's name and its usage data for the purposes set out in this Section 4.

**5.    Data Protection related obligations**

5.1    Customer agrees that:

5.1.1   Distributor and Dow Jones do not warrant that the Dow Jones Data includes a complete or accurate archive of every public figure or their associates, company, or news events in each country. Distributor does not imply any negative inferences about Data Subjects or entities referred to within the Dow Jones Data merely due to their inclusion within the Dow Jones Data.

5.1.2   As to the Processing of Dow Jones Data for the purpose of servicing Customer Queries, Customer is responsible for the material compliance with Applicable Data Protection Law of the Customer Queries and further Processing by Customer (including onward transfer, of the Dow Jones Data made available to Customer in the Customer Query Report) which includes responsibility for: (i) informing Data Subjects to whom the Customer Query or Customer Query Report relates, and obtaining their consent, if applicable; (ii) obtaining any required approvals from a regulatory or supervisory authority; (iii) establishing, and maintaining appropriate records of, the legal bases on which Dow Jones Data is Processed by Customer; (iv) determining the scope of the data included in the Customer Query Report; (v) ensuring data transfer mechanisms are in place where Dow Jones Data in the Customer Query Report are transferred outside of the EEA ; (vi) responding to any access and correction requests of Data Subjects in respect of the further Processing of Dow Jones Data made available to Customer in the Customer Query Report; and (vii) implementing appropriate technical, physical and organizational security measures, having regard to the state of the art and the costs of implementation, to protect Dow Jones Data against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access and against all other forms of unlawful Processing.

5.1.3   Customer shall implement and be responsible for appropriate technical, physical and organizational security measures, having regard to the state of the art and the costs of implementation, to protect Customer's equipment (including devices used by Permitted Users to access the Services) against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access and ensure secure access of Permitted Users to the Services.

5.1.4   The Services involve the Processing of Personal Data, which may include Special Categories of Data and Criminal Data. Customer acknowledges that under certain Applicable Data Protection Laws, and in particular those of the EEA, the Processing of Special Categories of Data and Criminal Data is strictly regulated and is only permitted on specific legal bases. The Dow Jones Data may be used by Customer only for the following purposes ("**Purposes**"), and Customer shall ensure that the Dow Jones Data is not used for any other purpose:

(a)    performing customer or counterparty due diligence and other screening and risk management activities carried out to comply with legal or regulatory obligations to which Customer is subject, in particular "know your customer and counterparty" requirements under anti-money laundering, anti-bribery, corruption and economic sanctions regulation which apply to any member of the group of companies of the Customer;

(b)    performing a statutory role as a Governmental organization;

(c)    performing law enforcement duties;

(d)  any establishment, exercise or defense of legal claims relating to Sections 5.1.4 (a) to (c) above,

each to the extent permitted under, and subject always to, Applicable Data Protection Law.

Customer acknowledges that, depending on the country or countries in which Customer is established and is using the Service, the laws of such country or countries may apply. Customer further acknowledges that in some jurisdictions (in particular some EEA countries), the legal bases for Processing Special Categories of Data and Criminal Data may be limited to performing due diligence and other screening activities in order to comply with legal or regulatory obligations of Customer in the relevant country only. In those cases, Customer shall ensure that the Processing of the Dow Jones Data is limited to those purposes as authorized under relevant applicable law only (including Applicable Data Protection Law).

5.1.5 In addition to its obligations under this Section 5.1, Customer shall comply with its obligations under Applicable Data Protection Law.

5.2  **Cross-border transfers to a country outside the EEA.** In the event that the servicing of Customer Queries involves a cross-border transfer of Personal Data outside of the EEA, and if required by Applicable Data Protection Law, such transfer shall be subject to the standard contractual clauses available at http://eur-lex.europa.eu/legal-content/EN/TXT/?qid=1401799828216&uri=CELEX:32004D0915, which are incorporated herein.

5.3  **Inspection or audits by public authorities**. Customer shall submit its relevant Processing systems, facilities and supporting documentation to an inspection or audit relating to the Processing by a competent public authority if this is necessary to comply with a legal obligation. In the event of any inspection or audit, Customer shall provide all reasonable assistance to the Distributor in responding to that inspection or audit. If a competent public authority deems the Processing in relation to the Agreement unlawful, Customer shall take immediate action to ensure future compliance with Applicable Data Protection Law.

5.4  **Notification of non-compliance and right to suspend or terminate.** Each Party shall promptly notify the other Party: (a) if it cannot for any reason comply with its obligations under this EUA; or (b) becomes aware of any circumstance or change in Applicable Data Protection Law that is likely to have a substantial adverse effect on such Party's ability to meet its obligations under this EUA. Without prejudice to the termination provisions in the Agreement, each Party is entitled to temporarily suspend the Processing in whole or in part if such Party is unable to meet its obligations under this EUA, until such time that the non-compliance is remedied. To the extent such remedy is not available, such Party is entitled to terminate the relevant part of the Processing with immediate effect.

5.5  **Notice of disclosures.** Customer shall provide timely notice to Distributor if: (a) it receives an inquiry, a subpoena or a request for inspection or audit from a competent public authority relating to the Processing; or (b) it intends to disclose a Customer Query Report to any competent public authority, to the extent legally possible.

5.6  **Security Breach**. Customer shall provide timely notice to Distributor if it confirmed that a Data Security Breach has occurred in respect of a Customer Query or Customer Query Report and shall take adequate remedial measures as soon as possible as required by applicable law. Customer shall provide timely notice to Distributor if it detects or becomes aware that a Data Security Breach has occurred in respect of the Processing of Dow Jones Data and shall take adequate remedial measures as soon as possible.

5.7  **Data Deletion**. On termination or expiration of the Agreement, the Customer's rights to use the relevant Service shall cease and the Customer shall as soon as practicable purge all Dow Jones Data stored on any server within Customer's control, subject to any legal or regulatory requirements imposed on the Customer to retain copies of certain elements of the Dow Jones Data necessary, as determined by the Customer, for strictly limited archival, regulatory and/or compliance purposes (all on an otherwise passive, non-use basis).

**6.  Disclaimer, Limitation of Liability, Indemnity**

6.1  (a)  Customer agrees that Customer's use of the Dow Jones Data is on an "AS-IS" basis and Dow Jones and Distributor specifically disclaim any representations or warranties, express or implied, including without limitation, any representations or warranties of merchantability, non-infringement, or of fitness for a particular purpose. Dow Jones and Distributor make no representation, warranty, or guaranty as to the reliability, timeliness, quality, suitability, availability, accuracy or completeness of the Dow Jones Data. Customer acknowledges and agrees that errors or omissions contained in the Dow Jones Data shall not be made the basis for any claim, demand or cause of action against Dow Jones or Distributor.

(b)  NEITHER DOW JONES NOR DISTRIBUTOR SHALL BE LIABLE (JOINTLY OR SEVERALLY) TO CUSTOMER AS A RESULT OF CUSTOMER'S USE OF THE DOW JONES DATA FOR ANY OF THE FOLLOWING TYPES OF LOSS: (A) ANY SPECIAL, INDIRECT OR CONSEQUENTIAL LOSS; (B) ANY INCIDENTAL, PUNITIVE AND/OR EXEMPLARY DAMAGES; (C) LOSS OF PROFITS (WHETHER DIRECT OR INDIRECT); (D) LOSS OF BUSINESS (WHETHER DIRECT OR INDIRECT); (E) LOSS OF ANTICIPATED SAVINGS OR LOSS OF REVENUES (IN EITHER CASE, WHETHER DIRECT OR INDIRECT); (F) LOSS OF REPUTATION OR GOODWILL (IN EITHER CASE, WHETHER DIRECT OR INDIRECT); AND/OR (G) PENALTIES OR FINES (IN EITHER CASE, WHETHER DIRECT OR INDIRECT) (COLLECTIVELY THE "**EXCLUDED DAMAGES**") HOWSOEVER ARISING, WHETHER OR NOT CHARACTERISED IN NEGLIGENCE, TORT, BREACH OF STATUTORY DUTY, CONTRACT, OR OTHER BASIS OF LIABILITY, EVEN IF ANY OF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF OR COULD HAVE FORESEEN ANY OF THE EXCLUDED DAMAGES. CUSTOMER UNDERSTANDS AND AGREES THAT CUSTOMER'S USE OF THE DOW JONES DATA IS AT CUSTOMER'S SOLE RISK.

(c)  Notwithstanding anything to the contrary in the Agreement, Customer shall fully indemnify, defend and hold harmless Distributor and Dow Jones for any loss, claim, demand or damage (including reasonable attorneys' fees) suffered arising out of: (i) any breach by Customer of the representation and warranty given by Customer in Section 3.2 (*FCRA prohibition*); (ii) Customer's use of the Dow Jones Data or Customer's violation of this EUA or the Agreement; or (iii) Customer's breach of

Applicable Data Protection Law.

(d) NOTWITHSTANDING ANYTHING HEREIN OR IN THE AGREEMENT OR A SUBSCRIPTION FORM TO THE CONTRARY, DISTRIBUTOR'S MAXIMUM AGGREGATE LIABILITY TO CUSTOMER RELATED TO OR IN CONNECTION WITH THE DOW JONES DATA SHALL BE LIMITED TO THE TOTAL AMOUNT PAID BY CUSTOMER OVER THE TWELVE (12) MONTH PERIOD PRIOR TO THE EVENT OF DEFAULT FOR THE PORTION OF THE SERVICES THAT MAKE UP CUSTOMER'S SUBSCRIPTION TO THE DOW JONES DATA. NOTWITHSTANDING ANYTHING HEREIN OR IN THE AGREEMENT OR A SUBSCRIPTION FORM TO THE CONTRARY, DOW JONES' MAXIMUM AGGREGATE LIABILITY TO CUSTOMER RELATED TO OR IN CONNECTION WITH THE DOW JONES DATA SHALL BE LIMITED TO TWO HUNDRED DOLLARS ($200).

The provisions of this Section 6 shall survive any expiration or termination of this EUA or the Agreement.

**7.   Third Party Rights**

7.1   A person who is not a party to this EUA or the Agreement shall not have any rights to enforce any term of the EUA or the Agreement, save that Dow Jones may enforce its rights against Customer under this EUA notwithstanding the fact that Dow Jones is not a party to this EUA.

**8.   Rights of Distributor**

8.1   If Distributor is unable to obtain the Dow Jones Data from Dow Jones despite Distributor's reasonable efforts and is unable to continue to provide Dow Jones Data to its customers, Distributor may terminate Customer's right to access and use, and receive corresponding Services with respect to the Dow Jones Data upon six (6) months' notice to Customer.

8.2   In the event of a breach, or reasonably anticipated breach, of this EUA, in addition to any other remedies available at law or in equity, Distributor shall have the right, in its sole discretion, to immediately suspend the Services.

**9.   Updates to EUA**

9.1   Distributor may update this EUA in its reasonable discretion from time to time.

*Last updated: March 20, 2019*

Exhibit F

**DOW JONES** RISK & COMPLIANCE



# 12 Questions for a Financial Crime Controls Expert

## How to Get Adverse Media Right

Adverse media screening in compliance is the process in which a customer, or prospective customer, is ("screened against") negative news and data sources. This allows firms to spot a problem before the institution becomes associated with it, or allows its reputation or commercial standing to suffer as a result.

Although guidance on screening against adverse media is less structured than other regulatory requirements, for customer due diligence (CDD)—FATF recommendations state that financial institutions (FIs) must "understand their client's reputation,"—adverse media screening is increasingly considered an important aspect of well-rounded anti-financial crime programs.

To equip FIs with steps to improve their negative media screening, Guy Harrison, General Manager of Dow Jones Risk & Compliance, interviewed Victoria Meyer, a financial crime control specialist and Director of the Swiss International Business Academy (SIB Academy). Victoria emphasizes three main pillars for adverse media screening: policy, procedures for operationalizing that policy, and testing (both before purchasing a solution and after, when configuring it to the firm's risk).

## Questions

How should a firm define its adverse media screening policy?

Is there an industry standard for FIs?

Should banks approach new clients differently than existing clients?

Is list-based screening or searching news articles (using a data aggregator) more effective and efficient?

In terms of rumors and allegations, how should a firm make a decision based on something that has not been proven?

Can you explain false positives and what you call "invalid" false positives?

Is there too much focus on reducing false positives?

On procedure, how can a firm make its policy operational?

Is artificial intelligence (AI) needed to scale adverse media screening?

Are there limitations to adopting AI?

Can you expand on the importance of testing, particularly when using AI?

Considerations when selecting a vendor?

## Q: How should a firm define its adverse media screening policy?

Before acting, firms need a written policy that addresses the specific details, complexities and corresponding action plans. When doing so, be sure to answer:

- What is your definition of negative media?
- What kinds of crimes are you trying to cover? Is the severity relevant? If you aren't going to act on the information you receive, then do you really need that information?
- What media do you want to screen? Just traditional news publications? Blogs? Radio? What geographic scope is important to you?
- How far back are you screening? Five or 10 years—what's the archive depth? And is that for the date of the crime or the date the media article was published?
- Which clients are you going to screen? Are you going to put all of your clients through negative media screening or might you want to exclude the lower-risk ones?

Answer these questions based on your firm's risk-based approach, and document those answers so that everyone is clear on the aims of your media screening process. Remember, this is the starting point for configuring your screening system. Not having this policy documented risks delegating the definition of your risk appetite to whoever is configuring your system (which may well be a vendor).

## Q: Is there an industry standard for FIs?

Unfortunately, no! Though I sometimes wish someone would let me establish one so that firms had a good place to start from.

Banks take a variety of different approaches. Generally, they screen a longer look-back period when opening an account. Typically, when doing repeat screening, banks only screen media published since the last review date. They may screen 5-10 years' worth of media at the onboarding stage and then implement a rolling review every 12 months. Alternatively, they may set up an ongoing screening system that generates new alerts for existing clients as they are identified in any newly-published media.

## Q: Should banks approach new clients differently than existing clients?

From a policy perspective, it's difficult to justify screening for different types of crimes depending on whether they are new clients or existing clients (i.e. a bank's risk-based approach will always define that it doesn't want fraudsters/terrorists/money launderers, etc. in their client base).

However, there is some justification for FIs to have a different negative media screening approach for existing clients versus for new clients. This doesn't mean an entirely different risk appetite, but rather a balancing of media screening as part of the overall know-your-customer (KYC) mix. When a bank is opening a new account, it does not have any kind of transaction history or internal data about the customer. That makes the KYC guidelines a critical line of defense. But once a client relationship exists, part of the defense with that client is the overall picture—not just adverse media screening, but also the transaction behavior and other information gathered during interactions with that client. Different media screening strategies may stem from the risk-classification of each customer, based on all information available.

Other strategies may be appropriate during transitional periods. From an operational perspective, institutions who are implementing their first comprehensive media screening process may take a risk-based approach to the initial screening of their existing client base to ensure hit-handling resources are targeted appropriately.

## Q: Is list-based screening or searching news articles (using a data aggregator) more effective and efficient?

I think they both have a useful role to play in the KYC process.

A list-based approach, which is screening against individuals known to have adverse media against them—like special interest lists from Dow Jones, for example—is more efficient than using a news aggregator, because the list entries have been specially curated for their relevance to AML objectives. These lists cover individuals with links to specific criminal activity or records (curated by a team of researchers that review unstructured news), including those prominently implicated in, formally accused of, arrested for or convicted of a serious crime like corruption, financial crime, trafficking, organized crime, terror and tax crime.

However, negative media screening does actually add something to your risk management processes, even when it's not being nicely put into a list for you. In particular, it provides information on activities that have not yet resulted in a criminal conviction, allowing you to take proactive measures to manage your risk. Negative news that does not necessarily involve a judicial case (often in investigative journalism) can be very valuable. For example, much of what is reported by the OCCRP Network has not gone through any kind of legal process (Russian oligarchs, etc., who are never going to get anywhere near a court) but their research can be very useful within the KYC process.

## Q: In terms of rumors and allegations, how should a firm make a decision based on something that has not been proven?

This is a question we often get asked.

I am uncomfortable with media screening programs that are based on the assumption that a suspicion of fraud (or implication thereof) is a lot less risky than a formal conviction for fraud. From my perspective, it's often just a question of time before a suspicion of fraud becomes a conviction for fraud. Discounting media reporting of suspicions of fraud is just putting off dealing with the potential risk: "We will wait until he's convicted and then we'll see that article." It's true that not all suspicions eventually turn into convictions, but there are many reasons why an accusation may never reach a judicial conclusion other than the person being innocent (for example, intimidation of witnesses or corruption within the judicial system).

My view is that all suspicions of criminality should be assessed to determine whether they are credible. Additional investigations, potentially including a review of activity on the account should help to clarify any concerns.  In some cases, new transaction monitoring rules may be defined to flag certain kinds of future activity on the account. Ultimately, that has to be more effective than waiting for a conviction to hit the press.

## Q: Can you explain false positives and what you call "invalid" false positives?

I think the biggest mistake firms make when testing false positives is not distinguishing enough between valid false positives and what I call "invalid false positives."

A valid false positive is something that the system has been configured to detect, and was worth someone taking the time to review manually. For example, your client is John Smith and there's another John Smith in a concerning article that fits your definition of negative media—that's a perfectly valid false positive (unless of course, the firm has other criteria within a system's settings that should have screened it out, like secondary identifiers).One way of reducing valid false positives is to use a system that is able to group media that reports essentially the same story (deduplication).  Other than that, reducing valid false positive hits can only be achieved by going back to the media screening policy.  Is your definition of "negative" too broad? Is it appropriate to include non-financial crimes? Is the look-back period longer than required? Can limits to geographic coverage be justified using a risk-based approach?

An "invalid" false positive is something that your screening policy does not require to be reviewed.  It may be an article that has nothing to do with financial crime, or a name match that is so dissimilar there is no way it should have generated an alert. In this instance, the answer lies in the configuration of the screening system and the vendor should be able to help you more closely align the system with your policy.

## Q: Is there too much focus on reducing false positives?

I think the problem lies when the apparent focus is only on reducing false positives. The worst possible starting point for a media screening program is the 'we must reduce false positives' approach. No bank can be protected from a regulator if all their documentation regarding screening strategy and configuration focuses on lowering hit rates.

Obviously any screening process has to be efficient and effective, but from the regulator's point of view, false negatives are the issue, and documentation must show that this concern has been addressed.

Rather than focusing on false positives, make sure that the program is built solidly from the ground up and then document risk-based justification for improving efficiency. The three main pillars (policy, procedures, testing) are equally crucial; you can't skimp on any of those steps.

## Q: On procedure, how can a firm make its policy operational?

When writing the policy, always think about how it is going to work in practice, and the procedures that will bring the policy into operation. That includes the specific action plans for each kind of hit generated.

I've touched on some of them, but this includes knowing:

- Who is doing the first line of the review?
- To where is a review going to be outsourced?
- If a reviewer gets an article in a language they don't understand, are they translating it? Or do they have a path for that article to go to (someone who can translate it for them)?
- If a reviewer faces a paywall for an article, what do they do?
- What are the criteria for escalating an alert? What is the escalation process?
- What management information systems or feedback process will allow managers to monitor efficiency?

The bottom line: ensure that your policy is operational. You shouldn't get any hits where you don't know what the path would be to deal with the concern raised. If you find you don't have a defined action plan for certain types of story, you either need to create an action plan for those cases or consider excluding them from your policy definition of "negative media."

## Q: Is artificial intelligence (AI) needed to scale adverse media screening?

AI is definitely the way forward. The internet is a very big place and given the volume of media firms are trying to screen already today, artificial intelligence has to be the way forward. Screening all of that information cannot be done without the help of natural language processing (NLP) and the kind of AI that will look at the media articles, eliminate duplicate information and group the remaining articles around the individuals and organisations that they are about.

## Q: Are there limitations to adopting AI?

Given that the companies applying AI to negative media screening have only been doing so for a relatively short period of time, it is really important for banks to test their results and to provide feedback to make sure that the AI develops in the way that's the most effective for the risk-management process.

Also, vendors often offer to train the AI on the bank's past data and decisions. If doing so, be comfortable that those are quality decisions: If the bank used an outsource team with very limited language skills to make decisions previously, then training a new, fancy AI tool based on these previous decisions is going to take all of that historical (not necessarily well-trained) decision-making into future processes.

Similarly, if the bank's past screening programs made decisions based only on English media, for example, then it won't provide a good basis for training a new system in other languages. In fact, I often find compliance operatives in Asia that are very unhappy with new systems, because the AI wasn't trained on the languages that are most relevant to them.

However, the greatest drawback to the use of AI is the tendency for people to just accept that "it's AI, it does what it does" without attempting to understand whether the results are appropriate. While we may not be able to document every step that determines "hit"/"no hit," the third pillar–testing–is as important as ever.

## Q: Can you expand on the importance of testing, particularly when using AI?

Sure. The extent to which firms are operating these algorithms as a black box can be a concern. They all have different settings and configuration options. If a regulator was to come in and prod: "Why have you made that decision? Can you explain the impact of that setting?", would you be able to explain the implementation? Would you be able to show that you've done sufficient testing, that you understand what the system is doing and that you know what it is giving you and what it will miss?

This requires a slight mindset change. With the introduction of AI, I think we have moved beyond the days of knowing exactly how technology is doing it all. That doesn't negate our responsibility as financial crime control officers to understand what it is doing and confirm that what it is doing meets our risk appetite.

AI is often based on the learning from past decisions. Without doing a full analysis of every bit of data that's ever been fed in, it isn't possible to understand how effective the past was and therefore, how effective the future will be—based on past decision making.

And so, this means you need to be rigorous about testing: Select a variety of articles that fit your definition of "negative." Create a search list using multiple variations of each of the relevant names and review the results. Make sure that the correct information is recalled by the system. This doesn't necessarily mean the exact same articles that you took the names from, but you need to know that the same level of risk is identified for each name, and with at least the same level of detail provided. Review false positive results and determine which are valid vs invalid false positives—and investigate those as mentioned before.

You have to be able to show regulators that you have done sufficient testing. That you understand what the system is doing, and that you understand what it might miss. Anything that falls under the policy definition that the system does not cover must either be subject to mitigating controls (such as a secondary screening for niche languages not covered by the main screening system) or documented as exceptions.

That ties up into the documentation. Again, if your documentation is only about hit volumes, the regulators will take a dim view, regardless of how well the system actually works.

## Q: Considerations when selecting a vendor?

The RFP process is critical. We are at a pivotal stage in the market for screening technology so the "safe option" of going with a market leader isn't really there.

Take the opportunity to ask as many questions as possible, to get an idea of the vendor's attitude and their understanding of KYC requirements. Take every detail out of your screening policy and ask how each vendor can support each requirement. Can they do this? Can they promise that? Ask for details.

Make sure that, upfront, the vendor at least says they can do what you want them to do. Ask as many questions as possible before you get into the actual testing process so that you focus your testing resources on those vendors most likely to meet your requirements. Above all, never skimp on the testing process, however strong a vendor's answers to your questions were. These are expensive decisions to roll back if you get them wrong.

Back to top

## Looking to connect?

### Contact Us

AutoFill with LinkedIn

First Name *

Last Name *

Email *

Job Title *

Company *

Country or Region *

Job Function *

Please Select

☐ I would like to receive updates and special offers from Dow Jones and affiliates, including recommended content or information on upcoming events. I can unsubscribe at any time.

By clicking the button below, you agree to the Dow Jones Privacy Notice and Cookie Notice

**SUBMIT**

Dow Jones Risk & Compliance is a global provider of best-in-class risk data, web-based software applications and due diligence services to help organizations manage risk and meet regulatory requirements across anti-money laundering, anti-bribery and corruption, sanctions and trade compliance.

Protect your organization with Dow Jones' proprietary risk database, research tools and integrated technology solutions for conducting efficient and effective due diligence checks on your new and existing customers.

**LEARN MORE**

© 2021 Dow Jones, Privacy Notice & Cookie Notice.

Exhibit G

2/23/22, 10:31 AM
What is a Special Interest Person Profile? | Dow Jones Professional
Case: 1:22-cv-01016 Document #: 6 Filed: 08/01/22 Page 80 of 99 PageID #:185

□□ | DOW JONES

# Risk & Compliance Glossary

Search the Glossary

Risk Glossary > What is Financial Crime? > What is a Special Interest Person Profile?

## What is a Special Interest Person Profile?



As part of customer due diligence (CDD), financial institutions need to understand the nature and purpose of customer relationships to develop customer risk profiles.

Some firms' approach to CDD also incorporates screening against (or continuously monitoring) a list of special interest persons or entities profiles because they may pose a heightened risk due to an increased likelihood of current or historical involvement in crimes.

There are no official lists of such individuals—creating and monitoring the profiles is at the discretion of the organization.

## How are Special Interest Person profiles compiled, generally?

A Special Interest Person (SIP) profile is of an individual who is alleged to have been involved in a criminal activity that falls under one of the following six categories:

- Trafficking
- Organized Crime
- Terror
- Tax Crime

The best practice is for SIP profiles to be created only if a source reports a criminal legal phase (usually from the arrest onwards) for the case, and if the alleged offense, with the exception of terror and human trafficking cases, exceeds a monetary threshold (as defined by the organization).

A SIP profile should never be created based on rumors or allegations that have not been substantiated in formal legal proceedings and profiles should include secondary identifiers from reliable, publicly available sources (secondary information helps organizations clear or confirm any possible name matches when monitoring SIPs).

Dow Jones Risk & Compliance can help your organization perform risk-specific assessments and can provide specialist lists covering a range of high-risk factors, including entity-specific lists, such as special interest persons and reputationally exposed persons.

**LEARN MORE** 

## Related Terms

- Customer Due Diligence (CDD)
- Threat of Financial Crime
- Secondary Identifiers



© 2022 Dow Jones



## DOW JONES

Equal Opportunity

Privacy Policy

Modern Slavery Statement

Cookie Policy

UK Gender Pay Gap Report

PIB Content Privacy Policy New

## Careers

Benefits

Our Employees

Career Growth

## Our Company

About Us

Sales & Customer Support

Press Room

## Media Brands

The Wall Street Journal

MarketWatch

Barron's

Financial News

## Business Offerings

Risk & Compliance

The Wall Street Journal

Factiva

Barron's

Dow Jones Developer Platform

MarketWatch

Dow Jones Newswires

View all Jobs



Exhibit H

2/24/22, 1:51 PM
Case 1:22-cv-01016 Document # 6 Filed 03/01/22 Page 84 of 99 PageID #:199
Banks are keeping closer tabs on your reputation than ever before — and it may explain why one Sapphire Reserve cardholder m...



LATEST UPDATES:   Officials say Ukraine no longer in control of Chernobyl nuclear site



BUSINESS
INSIDER

# Banks are keeping closer tabs on your reputation than ever before — and it may explain why one Sapphire Reserve cardholder mysteriously had his account shut down by Chase (JPM)

**Alex Morrell**

September 14, 2018



Chase Sapphire Reserve

David Slotnick/Business Insider

- **Over the past year, stories have piled up in online communities of credit-card super users suddenly having their accounts shut down by JPMorgan Chase.**

**Fix and speed up your slow PC with System Mechanic.**

Get it now »



⬛ **TRENDING**

**Russia attacks Ukraine; peace in Europe 'shattered'**
Associated Press · 8 min read

**Live updates: UN frees funds for humanitarian aid in Ukraine**
Associated Press · 21 min read

**What the West doesn't understand about Russia or**





2/24/22, 1:51 PM
Case 1:22-cv-01016 Document #: 6 Filed: 03/01/22 Page 85 of 99 PageID #:190
Banks are keeping closer tabs on your reputation than ever before | Yahoo explain why I have a Sapphire Reserve cardholder m...



game the points system to maximize rewards, was informed this summer that his accounts would be terminated by Chase.

- But even after his appeal, the company not only declined to reinstate him, but refused to disclose why his account was being closed in the first place.

- Unspooling the mystery behind Sequeira's shutdown shines a light on the broad power that credit-card companies have to cut ties with customers, as well as how banks, amid steep fines and intense scrutiny from regulators, are using technology to keep closer tabs on customers' reputations than ever before.

Over the past year, stories have started piling up in online communities of credit-card super users suddenly having their accounts shut down by JPMorgan Chase, one of the country's largest card issuers.

It opened up fervent analysis among the growing community of credit-card enthusiasts over the calculus used by card companies to sever ties with customers.

A seemingly similar tale of woe surfaced in the Facebook group Chase Sapphire Reserve Cardholders, a closed group of more than 10,000 members that is unaffiliated with Chase.

But upon closer inspection, the case of Bryan Sequeira proved particularly unusual and confounding.

"I received a letter that all my Chase cards are being closed. Has anyone else had that happen to them?" Sequeira, a 32-year-old product manager in healthcare IT based outside Boston, posted on the forum toward the end of June.

"The letter didn't state a reason. Just that it was closing in 2 months. Waiting for someone from the executive office to call me back," he added in a follow-up comment.

Trump again praises Putin moments before Russia launches invasion of Ukraine

Yahoo News · 2 min read

## POPULAR



**Latest weather with Leslie Lopez**

KABC – Los Angeles



**Omicron dashboard: Catch up fast**

Axios



**Winter storm approaching: 7-day forecast**

WABC – NY

**Nubability Athletes Foundation hosts snow camp at Soldier Mountain**

KIVI - Boise Scripps



**yahoo!** news

News   US   Politics   World   COVID-19   Climate Change   Originals   Health   Science   Podcasts   Contact Us   Videos

applying for the card in January. He applied and was approved for two other non-Chase cards in subsequent months, and he'd applied for but not yet closed on a mortgage. Otherwise, he had no other lines of credit opened in the past two years.

The Sapphire Reserve was a top-of-wallet card for Sequeira, an Indian citizen and US green-card holder who moved to New York for college in 2003 and has been steadily building credit since. And unlike many of the people who have had accounts shut down by Chase over the past year, he wasn't churning credit cards or gaming the system to maximize rewards.

**Read more:** *We recently dug into the rise of credit-card super users, the rewards arms race, and the myriad reasons banks can cancel your accounts.*

In short, he appeared to be a model customer — which is why he was so perplexed when Chase sent him letters saying his accounts would be shuttered in two months. Certain there must have been a mistake or misunderstanding, he tried to appeal the decision.

But when he pressed, the representatives he spoke with at Chase declined to reinstate him. Even more vexing, beyond a vague line in the initial letter saying the "relationship creates possible reputational risk," the company refused to disclose the reasoning behind why his account was being closed in the first place.

When Business Insider reached out to Sequeira, he confirmed what he wrote in the Facebook group: He'd been unable to change the company's mind, and he hadn't gotten representatives to tell him what had happened.

"I even asked her: 'So you know the reason but won't share it with me.' She said yes," he told Business Insider. "And it's within their rights. We just live in their world."

**Dover police hire social worker to fo[...] after crises**

WMUR - Manchester



**Snow tapers as wind chill advisory kicks in Tuesday night**

KMSP



**Muddy Creek flooding problems persist in Evans**

WKBW - Buffalo Scripps



**Trump news – live: Two NY prosecutors resign in ex-president's case, amid backlash for Putin 'genius' remark**

The Independent

**Flipping the philanthropy model**

KSHB - Kansas City Scripps

Case 1:22-cv-01016 Document #: 6 Filed: 03/01/22 Page 87 of 99 PageID #:192



one of his largest and longest-standing credit lines — would foul up the mortgage-lending process.

Moreover, he said Chase refused to refund any of the more than $500 he paid in annual fees on the cards.

A Chase spokeswoman declined to comment, saying the bank doesn't speak publicly about individual clients.

Business Insider spoke with credit-card experts, including a card executive and industry consultants with compliance and regulatory expertise, about the circumstances of Sequeira's experience and possible explanations.

His case illustrates the broad power that credit-card companies have to cut ties with customers, as well as how banks, amid steep fines and intense scrutiny from regulators, are keeping closer tabs on customers' reputations than ever before — and investing heavily in technology to facilitate their monitoring.

For Sequeira, the most likely possibility for his falling out with Chase and the bank's refusal to disclose why has to do with money laundering.

**Efforts to combat money laundering have ramped up**

Wait, what?

Sequeira, as best we can tell, isn't the kingpin of a criminal enterprise. He doesn't appear to have a criminal record at all.

But he wouldn't need to in order to run afoul of a bank's money-laundering detectors, which have grown increasingly vast and sensitive in recent years.

The federal government mandates under the Bank Secrecy Act that financial institutions proactively police their customers and alert authorities to potentially illegal behavior, including money laundering.

2/24/22, 1:51 PM

Case 1:22-cv-01016 Document #: 6 Filed: 03/01/22 Page 88 of 99 PageID #:193

Banks are keeping closer tabs on your reputation in the event of a card may expose why one's Federal Reserve cardholder m...



self-policing.

Regulators have become increasingly stringent over the years amid growing concerns about terrorism and drug violence, as well as major failings by large banks.

For instance, JPMorgan was hit with a $2.6 billion fine in 2014 as part of a deferred prosecution agreement after the Bernie Madoff Ponzi scheme revealed significant deficiencies in the bank's anti-money-laundering, or AML, compliance program. HSBC paid $1.9 billion in 2012 and served a five-year probation over AML lapses that allowed Mexican drug cartels to launder hundreds of millions of dollars.

The onus isn't on the bank to fully investigate or determine guilt — just to report suspicious activity. And the number of suspicious-activity reports banks have filed has grown steadily in recent years, to nearly 960,000 in 2016 from 714,000 in 2013, according to data from the Financial Crimes Enforcement Network, a division of the US Department of the Treasury.

That uptick is attributable in part to mandatory electronic filing, which went into effect in early 2013, making it easier and less time-intensive to file a report. But it's also because financial institutions, stricken by the multibillion-dollar penalties levied against some big banks, have determined it's safer to overreport than to miss something and wind up in the hot seat with the feds.

"Regulators are very harsh when it comes to AML, so many banks have adopted conservative policies," one credit-card executive told Business Insider.

Under AML rules, banks have to adhere to "know your customer" protocols to ensure they're not being used as a conduit for corrupt or illicit activity. At the most basic level, this means verifying a customer's identity and personal information, but it also involves monitoring lists

2/24/22, 1:51 PM
Case 1:22-cv-01016 Document #: 6 Filed: 03/01/22 Page 89 of 99 PageID #:194
Banks are keeping a closer tab on your reputation — here's why they might dig into Federal Reserve cardholder m…



proceedings, or otherwise unsavory information that might indicate that a customer requires a closer look.

"Banks pretty much universally do what are called 'negative news searches,'" Michael Brauneis, the head of the US financial-services practice at the consulting firm Protiviti, told Business Insider. "That's really an area that regulators have put a lot of emphasis on."

But how can a bank really know its customers when it has tens of millions of them, as the largest banks do?

Some have built automated processes to run customers' names through Google News or LexisNexis and feed back results that relate to litigation or criminal history and charges, according to Brauneis, who has two decades of experience in regulatory risk and compliance.

Regulation-technology companies like ComplyAdvantage, Ayasdi, and TransparINT have popped up to fulfill this service too, offering proprietary databases and screening tools that incorporate artificial intelligence and machine learning to better tailor and streamline the flagging process.

### Did a company settlement set off AML monitors?

So why might Sequeira have been flagged? Google News and LexisNexis searches show that in 2017, Sequeira's employer, eClinicalWorks, an electronic-medical-records company, agreed to pay $155 million to the federal government to settle claims that it had misrepresented its software and used shortcuts to pass some certifications. The company denied any wrongdoing, saying it settled to avoid expensive, protracted litigation.

A handful of employees, including senior executives, also agreed to pay settlements to avoid potential litigation and resolve personal liability while denying wrongdoing. Sequeira, a product manager, was among them. (No



that he had the support of his firm and that he agreed to pay the government $15,000 only to ward off any possibility of future litigation with the feds and to put the matter to bed.

"We didn't do anything wrong," Sequeira said. "The company didn't accept fault. We didn't accept fault."

But while the matter went away in the eyes of the government, a digital trail lingered.

Credit-card experts told Business Insider that, depending on the institution, the eClinicalWorks settlement could have tripped up AML negative-news monitors.

That alone wouldn't necessarily guarantee account termination. But JPMorgan, the largest bank in the US, likely has among the most advanced AML procedures. Following the Madoff scandal and the ensuing heavy scrutiny from regulators, the bank invested heavily in beefing up its AML systems, including installing automated systems.

The firm has gained notoriety for being aggressive in cutting ties with customers over reputational concerns to avoid any compliance headaches, and not just those found to be engaged in potentially criminal activity. The bank faced backlash in 2014 for canceling accounts held by porn stars — Stephanie Clifford, the adult-film actress best known as Stormy Daniels, was among them — and companies involved in the sex industry.

It also severed its payments relationship with the condom maker Lovability that same year, said to have cited "reputational risk," before reversing course.

The company's aggressive, conservative approach to compliance with regulators and its breadth of resources — JPMorgan has a $10.8 billion budget just for technology — might explain why Sequeira had his accounts flagged and terminated at JPMorgan but not other financial



Banks are keeping closer tab on your reputation in new ventures | Zach Guzman in why entuerprise Resolve cardholder m…

☰ HOME    MAIL    NEWS    FINANCE    SPORTS    ENTERTAINMENT    LIFE    SHOPPING    YAHOO PLUS    MORE Download the Yahoo News app →

**yahoo!** news

News    US    Politics    World    COVID-19    Climate Change    Originals    Health    Science    Podcasts    Contact Us    Videos

### 'Our goal is never to bank with Chase again'

Still, some aspects of Sequeira's situation remain murky.

Why was he approved for the card earlier this year and then flagged for termination six months later if that was based on information available since mid-2017?



Bryan and Amanda Sequeira

Bryan Sequeira

Additionally, Sequeira wasn't the only person named in the eClinicalWorks settlement who has Chase credit cards, yet he says colleagues told him they haven't had the same experiences with Chase. Was there some additional factor that came into play in his case?

2/24/22, 1:51 PM
Case 1:22-cv-01016 Document #: 6 Filed: 03/01/22 Page 93 of 99 PageID #:197
Banks are keeping closer tabs on your reputation — here's how credit cards explain why image | Business Insider cardholder me...



a window to rack up more charges, according to Braunei.

Chase declined to comment.

Though some mystery remains, Sequeira's relationship with the bank has concluded. His accounts were officially shut down on August 16. Chase ultimately agreed to prorate the annual fees he'd paid on the cards and issued him a refund.

For Sequeira, life goes on without Chase. He got married on August 16, and despite the potential credit scare, he's in the final stages of closing on the mortgage.

He said he'd moved on but wouldn't forget the episode.

"I would've preferred not to get approved at all than go through all of this," Sequeira said. "Our goal is never to bank with Chase again."

NOW WATCH: How Publishers Clearing House makes $1 billion a year

**See Also:**

- JPMORGAN: Trading revenues have dropped in the third quarter

- 31 beautiful photos of traditional wedding dresses from around the world

Our goal is to create a safe and engaging place for users to connect over interests and passions. In order to improve our community experience, we are temporarily suspending article commenting

Jenna Jameson discharged from hospital amid health issues: 'Still...
156 comments

Saints Owner Gives Best Response to Young Girl Who Applied for...
16 comments

Miss Alabama Zoe Sozo Bethel's Cause of Death Revealed
9 comments

Case 1:22-cv-01016 Document #: 6 Filed: 03/01/22 Page 93 of 99 PageID #:198

Banks are keeping closer tab on your reputation in the event of dispute | Paraguay explore why one captured Restore cardholder m...

☰ HOME   MAIL   NEWS   FINANCE   SPORTS   ENTERTAINMENT   LIFE   SHOPPING   YAHOO PLUS   MORE  Download the Yahoo News app →

**yahoo!**news


35 · Mail

News   US   Politics   World   COVID-19   Climate Change   Originals   Health   Science   Podcasts   Contact Us   Videos

✕



**INSIDER**

### Putin announced attacks against Ukraine on Thursday in the same suit he wore for his Monday

In videos that aired on Monday and Thursday, Russian President Vladimir Putin appeared to wear the same black blazer, white shirt, and maroon tie.

14h ago



**The Hill**

### Finland says debate on NATO membership 'will change' after Russian invasion

Finish Prime Minister Sanna Marin on Thursday said Russia's invasion of Ukraine will change the debate around NATO membership within her country."Finland is not currently...

3h ago



**Yahoo News Canada**

### 'If we don't deter Russia, Canada is going to be affected directly': Attacks on Ukraine could threaten

An international relations expert is warning that the attacks on Ukraine by Russian forces will lead to dire consequences unless the leaders of other nations change how they deal...

2h ago



**INSIDER**

### Trump falsely blames Russia's invasion of Ukraine on 'rigged election' in the US before Fox News cut him

"It all happened because of a rigged election," former President Donald Trump said, repeating lies about the 2020 US election.

14h ago



**People**

### What Really Happened to Bob Saget? New Details on His Final Hours

Police believe that a groggy Bob Saget regained consciousness and stumbled into bed, where he again lost consciousness and died

1d ago



**The Week**

### The real reason Putin played a pussycat during the Trump presidency

The real reason Putin played a pussycat during the Trump presidency

1d ago

**The Week**

### Fighting breaks out near Chernobyl, leading to fears of nuclear contamination over Europe

Fighting breaks out near Chernobyl, leading to fears of nuclear contamination over Europe



Yahoo TV

**'Wheel of Fortune' viewers stunned by contestant's incorrect answer**

It was a rough night for "Wheel of Fortune" contestant Tenaya, Wednesday, as she came so close to landing a large prize.

11h ago



In The Know by Yahoo

**Woman mortified after stylist charges her $300 for 'emo hair': 'I can never leave the house'**

The haircut looked completely different in the reference photo.

21h ago



INSIDER

**The 2 prosecutors leading the Manhattan DA's investigation into Trump abruptly resigned**

The resignations came after the new Manhattan DA expressed doubts about moving forward with a case against Trump, The New York Times reported.

23h ago



USA TODAY

**A teen ate leftover rice and noodles. Hours later, doctors amputated his legs and fingers**

Just hours after eating leftover rice, chicken and lo mein from a restaurant, a Massachusetts student was in the hospital with meningococcal disease.

2h ago



Bravo

**Porsha Williams Wears the Tiniest Denim Bikini While on Vacation with Simon**

Porsha Williams is making her romantic getaway with her fiancé, Simon Guobadia, one to remember. On February 20, The Real Housewives of Atlanta: Porsha's Family Matters ca...

1d ago



Argus Leader

**Garretson principal, football coach Chris Long fired after 5 hours of closed-door deliberations**

After five hours in executive session, the Garretson school board voted to fire middle and high school principal and head football coach Chris Long.

2h ago

NASCAR.com

**NASCAR penalizes two Cup Series teams for lost wheels, releases statement on wheels**

NASCAR penalized two Cup Series teams on Wednesday for losing wheels from their race cars during Sunday's Daytona

2/24/22, 1:51 PM
Case 1:22-cv-01016 Document #: 6 Filed: 03/01/22 Page 95 of 99 PageID #:200
Banks are keeping closer tab on your reputation in the wake of data breaches, card fraud and may... : Yahoo cardholder m...



**yahoo!** news

35 Mail

News   US   Politics   World   COVID-19   Climate Change   Originals   Health   Science   Podcasts   Contact Us   Videos

Russia's Ministry of Foreign Affairs said it was open...

1d ago

✕

**HuffPost**



**GOP House Candidate Seen Berating Cop, Calling Her 'Immigrant' During Traffic Stop**

Martin Hyde threatened the job of a police officer who said she'd pulled him over for speeding and using his phone while driving.

19h ago

**Cosmopolitan**



**Khloé Kardashian Shared Another Topless Photo on Instagram, and It's as 🔥 as You'd Expect**

Khloé Kardashian just shared another topless photo in her new Instagram post, and it's as fire as you'd expect.

1d ago

**KCRA - Sacramento Videos**



**El Dorado Superior Court prohibits operations at Apple Bistro**

Apple Bistro, located off Highway 50 in Placerville, is closed after the El Dorado County Superior Court issued a preliminary injunction to prohibit all operations. The order...

2h ago

**USA TODAY Sports - Golfweek**



**'I don't think it's right': Jack Nicklaus on potential Saudi-backed golf league; Xander Schauffele also out**

Add Xander Schauffele to those publicly pledging allegiance to the PGA Tour's flag.

4h ago

**Quartz**



**The best explanation of the situation in Ukraine comes from Kenya's ambassador to the UN**

Kenya's ambassador to the UN, Michael Kimani, compares situation involving Russia, Ukraine, Donetsk, and Luhansk to colonialism in Africa.

2d ago

**The Week**

**China blames U.S. for war in Ukraine, even as it appears increasingly uncomfortable with standing**

China blames U.S. for war in Ukraine, even as it appears increasingly uncomfortable with standing by Russia

5h ago

**INSIDER**

**Legendary goalie Hope Solo slams the US women's soccer team's equal pay settlement as 'heartbreaking and infuriating'**

Case 1:22-cv-01016 Document #: 6 Filed: 03/01/22 Page 96 of 99 PageID #:291





In The Know by Yahoo



**Milwaukee Journal Sentinel**

**Wauwatosa clerk 'learned of' 58 unopened absentee ballots from primary election. The results could**

Wauwatosa will hold a recount on Thursday morning after the clerk's office learned of 58 unopened absentee ballots from the Feb. 15 primary election.

4h ago



**USA TODAY**

**You might want to throw those leftovers away: What to know about storing rice, noodles**

How can you safely store your leftover rice or pasta dish? What about other leftovers? Here's what you need to know about safely eating these foods.

2h ago



**People**

**Anthony Edwards and Mare Winningham Quietly Eloped Last Year: 'We're Too Old to Throw Weddings'**

"She's an amazing singer and she's a wonderful actress and she's an incredible person," Anthony Edwards said of wife Mare Winningham

1d ago



**NBC Sports Philadelphia**

**Philly 'shot doctor' Herb Magee roasts Ben Simmons' work ethic**

Even though Ben Simmons has skipped town, it's clear the Philadelphia basketball world isn't done expressing its frustration with his approach while he was here. By Adam...

5h ago



**NBC News**

**Tennessee woman accused of trading items for sexual encounters with 9 high school students**

Melissa A. Blair, of Englewood, Tennessee, is accused of having sexual encounters with nine high school boys for more than a year, authorities say.

2d ago



**INSIDER**

**I made a baked potato the 'British' way, and the inside was incredibly soft and fluffy**

I'm an American who made jacket potatoes, which have crispy skin and super buttery insides. Here's how I made the tasty UK-style dish.

21h ago

Women's Health

**Watch Gisele Bündchen Completely Crush Her Jiu-**



NEWS

**Charlize Theron Opened**

"I was in survival mode."View Entire Post ›

23h ago

**MarketWatch**

**'We are in new, dangerous territory': Here's how NATO must respond to a Russian 'triple threat' that**

With the largest concentration of hostile Russian military forces since the Cold War positioned within and around Ukraine, we are now in a new era of history. It will be a…

7h ago

**Myrtle Beach Sun News**

**Former NC police chief, recently considered drowned, arrested in Horry County, SC**

The former police chief never returned from a fishing trip in North Carolina and was reported missing after authorities conducted an "extensive water search."

5h ago

**People**

**Maks Chmerkovskiy Posts Tearful Clips from Kyiv as Russia Invades Ukraine: 'I Want to Go Back Home'**

Maks Chmerkovskiy shared a series of videos to Instagram Thursday that gave his followers a glimpse of the Russian invasion in Kyiv, Ukraine

5h ago

**Access Hollywood**

**Sam Hunt's Pregnant Wife Hannah Lee Fowler Refiles for Divorce In Different County**

It looks like Sam Hunt's pregnant wife wasn't pressing the pause button after all. After withdrawing her divorce complaint against the country singer on the same day she…

1d ago

**Footwear News**

**Britney Spears Brings 'Bridesmaids' and Botox Midair in Short Shorts and Block-Heeled Sandals**

Spears mimicked "Bridesmaids" and contemplated botox while traveling, wearing short shorts with brown platform sandals.

4h ago

**BuzzFeed News**

**The US Version of the Canadian Trucker Convoy Had a Tough First Day**

Truckers started an 11-day journey from California to Washington, DC, on Wednesday, hoping to emulate Canadian protesters and attract supporters along the way.View Entire…

22h ago

Case 1:22-cv-01016 Document # 6 Filed: 03/01/22 Page 98 of 99 PageID #:293



